---

## EX PARTE BIBB.

[APPLICATION FOR MANDAMUS TO COMPEL CIRCUIT COURT TO GRANT A NEW TRIAL, AND FOR SUPERSEDEAS TO STAY SALE OF PROPERTY ON JUDG-MENT SOUGHT TO BE SET ASIDE, UNTIL DECISION BY SUPREME COURT.]

1. *New trials, grant of; when may be authorized.*—The loyal, rightful, legislative power of the State, may by law authorize the grant of new trials in its own courts, where there was a good and meritorious defense in the first instance.

2. *Same; what sufficient ground to support.*—It is sufficient grounds to open a judgment of a court of the insurgent government, erected in the State of Alabama, after the suspension of the rightful government which existed prior to the 11th day of January, 1861, and to grant a new trial therein, that such judgment was for a larger sum than might probably be due, and that one of the defendants therein was a Union man before the passage of the ordinance of secession, by the insurgent authorities. Very slight grounds in such case should be sufficient to justify the grant of a new trial.

3. *Original jurisdiction of supreme court; powers conferred by constitution, how used.*—This is an application for *mandamus*, and it invokes an exercise of the original and separate powers of this court for the control of inferior jurisdictions. In such a case, the court acts under its own discretion, guided by the purposes of law and justice, and it will control by its process all the officers of the inferior courts, with the judgments of which it is asked to interfere. This process the court will construct as it may think wisest, under the purposes of the high powers with which it is clothed by the people by a constitutional grant.

This was a motion for a rule *nisi* to issue to the circuit court of Montgomery, to show cause why a *mandamus* should not be issued to compel said court to declare void, vacate and set aside, a certain judgment (more fully set out in the opinion), and to grant a new trial, &c., and for such other remedial writ or process, as might be necessary, the court below having refused to set aside said judgment, &c.

The facts upon which the application was based, as well as those in relation to the order of the court suspending a sale of the property, upon executions issued on the judgment sought to be set aside, until the decision of the court upon said application, will be found in the opinion.

The case was elaborately argued at the bar, but the briefs which came into the hands of the reporter, which are here inserted, do not give the full scope of the argument on either side.

STONE, CLOPTON & CLANTON made the following argment in support of the motion :

The decision in the case of *Weaver v. Lapsley*, at the present term, declaring unconstitutional the act of December 17th, 1868, and, separately, the second section of said act, makes it necessary to inquire, whether the principles of that decision affect the constitutionality of ordinance No. 39, or, can the constitutionality of that ordinance be sustained upon other grounds ?

The act of December 17th, 1868, was an act of the legislature—the ordinance was an act of a convention ; and, whilst a convention can not violate the constitution of the United States any more than a legislature, yet, at the time the convention of 1867 assembled, the constitution of the United States had not extended its protection over the judgments and decrees of the courts in the southern States rendered during the war.

That convention derived its authority from the reconstruction acts, by virtue of which it was convened. The theory of these acts is, that the governments, existing in the southern States prior to 1861, had been overthrown and destroyed ; that no legal governments existed in those States ; and that reconstruction was necessary by the or-

ganization of a new government ; and that the conquering power, the United States, had the right to dictate the terms of reconstruction.    Hence, for this purpose, the convention was authorized.    That convention, so far as related to Alabama, represented the conquering power, and had the power to say upon what terms the State should be reconstructed in reference to its domestic internal affairs, provided that there was no violation of the reconstruction acts ; and hence, to say what force and effect should be given to the judgments of the courts rendered during the war—more especially, as, after Alabama should be reconstructed and readmitted into the Union, its officers would be called to execute these judgments.

What, then, did the convention do ?    Without declaring the validity of these judgments, and leaving to be determined by the courts whether they were ·void or not, the convention did ordain that they were, at least, *voidable*, and to be avoided upon a meritorious defense being shown ; that is, those judgments rendered when there was neither a *de jure* or a *de facto* government, should not have the conclusiveness of judgments by competent courts, but that the courts of the reconstructed State of Alabama should avoid them, or set them aside, whenever a meritorious defense existed.    This is the legal effect of ordinance No. 39.    It is the same in principle, as if congress, in the reconstruction acts, or in the act admitting Alabama under the present constitution, had enacted that the courts of the State should open these judgments upon certain conditions ; or, perhaps, more analogous, congress had enacted that the courts of the United States should set aside the judgments of the courts of the Confederate States upon a meritorious defense.

The constitution of the United States having no vitality, or operative force in the State during the war, and these judgments, being rendered at such a time, can not be said to be *contracts protected* by the constitution.

The constitution framed by that convention had no force until approved by congress ; and the three departments of the government, as they now are, did not until that time exist.    The convention which framed that constitution

adopted this ordinance—they were cotemporaneous. Hence, there can be no pretense that a legislative department is infringing the prerogatives and powers of the judiciary department. At the time the act of December 17th, 1868, was passed, there was a legislative and a judiciary department.

If these principles be correct, it necessarily follows that ordinance No. 39 is constitutional and valid.

The constitutionality of the ordinance being established, it follows, that if a meritorious defense exists, the applicants have a *clear legal* right to have said judgment opened, in order that they may have an opportunity to establish that defense. The object of the ordinance was to prevent injustice by the enforcement of a judgment rendered by a court not legal and competent, and upon a cause of action to which the defendant had, in whole or in part, a valid defense, which defense he was prevented from making, by any cause whatever, before such judgment was rendered. The only condition upon which his *right* to have the judgment opened depended, is the existence of a meritorious defense. The language of the ordinance is, "*shall be entitled to a new trial.*" These words are mandatory. The words "may," or "it shall be," when used in a statute, are peremptory, where the public or an individual has a right *de jure* that the powers conferred by the act should be exercised.—*Tarver v. Comm'rs Court of Tallapoosa*, 17 Ala. 527; *Ex parte Banks*, 28 Ala. 28.

Neither the ordinance, nor any subsequent statute, provides for *an appeal* from the decision of the circuit court, either refusing or granting such applications; and no other special way has been provided by which to bring such a decision before the supreme court. *Mandamus*, then, is the remedy; for where there is a clear legal right, and no other remedy, *mandamus* is the proper remedy.—*Stevenson v. Mansoney*, 4 Ala. 31*l*; *Tarver v. Comm'rs Court of Tallapoosa, supra; Ex parte Garlington*, 26 Ala. 170.

It may be said, that a *mandamus* is to compel the court to act; but not to direct how to act. This is correct as a general rule; but it has its limitations, as follows: 1st. The *way to act* must be left in the discretion of the judicial offi-

cer. In this ordinance, *the way to act* is mandatory; he shall grant a new trial, upon satisfactory showing of a meritorious defense. He must, necessarily, judge of the sufficiency of the showing as he determines the rights of litigants in other controversies—a judicial judgment—but if he errs, this error does not deprive the applicant of his right to have a new trial. 2d. If a party has a clear legal right to have a *certain, specific act* done by a court, a *mandamus* will issue to compel the court to do *that certain, specific act*. For instance, a *mandamus* will issue to compel the circuit court to strike a cause from the docket, or to re-instate.—*Ex parte Robbins*, 29 Ala. 71; *Ex parte Lowe*, 20 Ala. 330; to enforce an agreement made in reference to a pending suit—*Ex parte Lawrence*, 34 Ala. 446; and, whilst it will not issue to compel the court to quash an original attachment, because it is the leading process, yet it is intimated, that it will issue to compel the quashing of ancillary attachments.—*Ex parte Putnam*, 20 Ala. 592.

But if a *mandamus* is not the appropriate remedy, then we insist that, by the constitution, the supreme court has a general superintendence and control over the inferior courts of the State, under such regulations as may be adopted by the legislature; and by section 660 of the Revised Code, the supreme court has power to grant injunctions, *habeas corpus*, and such other *original* and *remedial* writs, which may be necessary to give a superintendence and control over the other courts. The purpose is to give the supreme court a general superintendence and control; and if the writ of *mandamus*, injunction, &c., (power to issue which is specifically given,) is not appropriate, then the court can issue such other original and remedial writs as will accomplish this purpose; and, if there is no appropriate writ known in practice, then the court can make one, if it be necessary to enforce this superintendence and control.

*Certiorari* is the proper remedy to *revise* the action of an inferior court, when no other way has been provided.

If, then, the court should be of opinion that a *mandamus* is not proper, because the ordinance submits the question of a meritorious defense to the decision of the circuit court,

then we insist that a *certiorari* should issue to enable this court to revise that decision, and correct the action of the circuit court, if erroneous, thus exercising its general superintendence and control; or, if necessary, a writ for this purpose should be adopted. The jurisdiction of the court will not be suffered to fail for want of a proper writ or process.

Now arises the question, is there a meritorious defense? The defense is usury; which, in itself, is meritorious, favored by the law, because a usurious contract is illegal, and opposed to public policy. Is there, then, usury in the contract, or bill of exchange, upon which the judgment was rendered?

[Here follows an argument to show that the contract on which the judgment was based was usurious.]

Admitting, however, that there was no usury in the bill of exchange, and that the ordinance is unconstitutional, still this court ought to issue a *mandamus* to compel the circuit court to vacate or open said judgment, for the reason that it is void, and whilst it stands is a cloud upon the title to the property of the applicants and an apparent incumbrance.

The judgment was rendered in November, 1861. The then controlling authorities in Alabama were not a government *de facto*, as decided in *Chisholm v. Coleman,* at present term. If the whole was not a government *de facto,* its component departments separately, could not be. Here the court were not *de facto* courts, and every judgment rendered by them is void. The government in Alabama, at that time, as decided in the case above cited, was a rebel government, in hostility to, and not a part of the government of the United States. Equally, each constituent department thereof was in hostility to the government of the United States, necessarily, as officers, and in their official capacity and relations, those who held office under that government. The old government, says the court, had been destroyed, and these officers, judges or others, could not hold office as part and parcel of a rebel government, and ask recognition *now*, by virtue of their commissions from a destroyed government, or that their acts as such officers are,

therefore, valid. Courts can, at any time, declare a void judgment void, and open it, and it is their duty to do so. *Johnson v. Johnson's Adm'r*, 40 Ala. 246, and cases cited.

It will be contended, however, that this point was not made in the circuit court, and ought not to be considered by the supreme court. It is not necessary that the record should show that it was. The bill of exceptions was necessary to bring before this court the facts as to the meritorious defense, and so far as the application depended upon the evidence; otherwise, these facts would not appear. The motion entered on motion docket at January term, 1869, of the circuit court, is broad enough to cover and embrace both grounds for opening the judgment, upon a meritorious defense under the ordinance, or because it is void. The latter—that it is void—appears from the record itself, and no bill of exceptions is necessary to prevent it. No specific grounds are stated in the *motion*. When an error is apparent from the record, the supreme court will consider it, although the objection was not made in the other court.—*Crothers v. Heirs of Ross*, 17 Ala. 816—or, when it appears that the court had no jurisdiction.—*Wyatt v. Judge*, 7 Porter, 3*l*. In this case, the court says, "it may, perhaps, be thought, that inasmuch as this objection was not made in the circuit court, it should not be regarded here. We understand the law to be otherwise. It was the duty of the circuit court, *mero motu*, to have repudiated the appeal, and it is certainly our duty to do what that court should have done. So, in this case, when it became apparent to the circuit court that this judgment was void, it was the duty of that court to have so declared on the motion then before the court; and it is the duty of this court to do what that court should have done.

This duty becomes the more imperative, if we consider the public interest. If these judgments are void, the good of the public requires that it should be known as early as possible. Soon, property will be sold under these judgments. If void, no title passes, and purchasers lose their money; if valid, in the uncertainty, property will be sacrificed.

ELMORE & GUNTER, and E. J. FITZPATRICK, against the motion.

It is well settled that, in case of a change of rulers, either by treaty or conquest, the relations of citizens to each other and their rights vested under the government displaced, are not altered or affected.—*Leitensdorfer v. Webb*, 20 How. 176, and authorities there cited.

The principle on which this rule is established is, that it is the interest of civilization that all communities shall, at all times, obey some law and some ruler, and it is better for humanity there should be bad laws and bad rulers than that social chaos should exist. The good order and stability of society demand this rule shall be observed, and that individual rights shall not be left to the chance of loss by changes of government so liable to occur from the many causes of popular commotion. The rule applies equally, whether the displaced government is *de facto* or *de jure*—a lawful government, or one which only exists by reason of its power to maintain itself for the time being.

The supreme court of the United States, in the case of *Texas v. White, et al.*, have settled that the State of Texas had, during the rebellion, a government *de facto* for domestic and municipal purposes, though that government was not such so far as its acts in aid of the rebellion were concerned. This court has accepted (in *Reynolds v. Taylor*,) that portion of the opinion of the court as correct. The status of Alabama was precisely the same, and its laws and organization "for remedies for injuries to person and estate" were valid.—*Texas v. White.*

The court rendering the judgment, here sought to be annulled, was part of the State organization, and rendered the judgment in administering the law "providing remedies for injuries to person and estate." If the law was valid the court was valid, and the judgment good then and now.

If it be said that the ordinance of secession was a nullity, and the State still in the Union, then its laws in force on 11th January, 1861, remained in full force. These laws provided for courts and furnished "remedies for injuries to person and estate." If no person could administer them, they were useless, and the protection they offered was lost

to all persons, even the most faithful to their allegiance. The organization of the courts remained after secession as it was before. The same individual who was judge of the second circuit *before*, continued to be judge of that circuit *after* secession. If the ordinance could not take the State out from the Union, how could his opinions and sentiments, and the expression of them, either in the caption to the minutes of the court or in the speech proven in the evidence, take out of him the judicial power and jurisdiction reposed in him? The relation of the court to the State as it was before secession, and as it is now, was unaffected by the ordinance or his sentiments either.— *White v. Cannon*, 6 Wallace, 443.

Judgments rendered after 11th January, 1861, in courts of record, are recognized as valid by ordinance No. 39 of the convention of 1867. New trials in certain classes of such judgments are granted by that ordinance; if such judgments are void, what necessity for new trials?

The legislature of 1868 adopted the Revised Code of Alabama.—Acts of 1868, p. 7.

That Code contains ordinance 26 of convention of 1868. Besides, the convention of 1865 has been determined by this court to have been part of a valid provisional government. In *Herbert & Gessler v. Easton*, at this term, this court treats ordinance No. 26 as a valid law. That ordinance, in its first section, ratifies and confirms "all judgments, orders or decrees of the several courts of this State rendered after 11th January, 1861."

Sections 2825 and 2827 of that Code provide new trials in judgments rendered between 11th January, 1861, and 1st May, 1865, and 1st January, 1867.

Section 2832 provides that executions may issue on judgments rendered "since 11th January 1861, and prior to 15th December, 1865."

The legislature of 1868 provided for appeals to the supreme court from probate courts on all final decrees "since January 11, 1861."—Acts of 1868, p. 39.

And for new trials on judgments rendered prior to 25th May, 1865.—Acts of 1868, p. 415.

And in the act known as the *bona fide* purchaser's bill,

they amended the several laws pertaining to liens of judgments, and treat such laws and judgments rendered during the war as valid.—Acts of 1868, p. 266.

Besides these, the legislative and official acts of the State government and officers, during the rebellion, are recognized in a degree more or less direct in the acts of 1868, on pages 12, 13, 23, 25, 88, 392 and 502, and by ordinances No. 16, 37, 38 and 40 of the convention of 1867.

After examining the above citations, no one can entertain a doubt that the convention of 1867 and the legislature of 1868, as well as the convention of 1865 and the legislatures of 1865–66, and 1866–67, fully recognized as valid the action of the courts during the rebellion in so far as it was not in aid of the war, or in conflict with the constitution of the United States.

This recognition is by the *political department* of the State. It does not restore vitality to a dead thing, nor make that of force which was void, but it recognizes that such action of the courts was valid then and valid now, for all purely domestic and municipal purposes between individuals.

Recognition of the validity of judgment is not passing upon the rights involved in the matter tried before the court, and can not be said to infringe the constitutional provision forbidding a citizen to be deprived of property without due process of law.

But if the validity of this judgment were doubtful even, it should be sustained rather than bring upon a people the unnumbered woes and wide-spread ruin that a contrary decision would produce. It is a settled rule of courts in doubtful cases, to adopt that view and rule which is the most likely to give general peace and repose. The whole country has acted upon the idea of the validity of courts during the war; to destroy that idea would be to open a flood of litigation and controversy which would be disastrous in the extreme.

Since preparing the above, we have seen what Judge Chase decided in the united States circuit court of Virginia, in the case of *Evans & Evans v. the City of Richmond,* viz: " That the governor, legislature, and judges of Vir-

ginia, during the war, constituted a *de facto* government. They exercised complete control over the greater part of the State, proceeding in all the forms of organized government and occupying the capitol of the State."

PETERS, J.—The facts upon which the determination of this case depends, are these :

On the 3d day of May, 1861, Howell Rose brought suit against J. F. Jackson, Thomas J. Judge, William C. Bibb, and Benajah S. Bibb, in a court styled in the record, the circuit court, in the county of Montgomery, in the State of Alabama. This suit purports to have been instituted for the recovery of twenty-five thousand dollars, due and owing on a bill of exchange, drawn by the above defendants and accepted by Thomas H. Watts and William H. Rives, and dated March 27th, 1860, and payable twenty months after date thereof to Howell Rose, the plaintiff. Protest and notice are waived on the face of the bill, and it was payable at the office of Benjamin Trimble, in Wetumpka, Alabama. Interest and damages are claimed in the complaint, and it is alleged that " the same not being paid at maturity, was duly protested, of which said defendants had due notice." This cause was tried before the Hon. Nat. Cook, judge presiding, on the 19th day of November, 1861, and "of the independence of the Confederate States the first year," when the suit was discontinued as to Judge, who had not been served with process, and judgment was taken against the other defendants for the sum of $27,-609.65, the demand in the complaint mentioned, together with costs of suit.

Afterwards, on October 29th, 1868, the said Benajah S. Bibb and William C. Bibb moved in the circuit court of the county of Montgomery, in this State, in the office of which court the record of said judgment is found, for a new trial in said cause ; the said Jackson having died after the rendition of said judgment, and before the making of said motion. This motion was regularly continued in said court in which it was made until December 2d, 1868, when it was heard and refused. On the trial of this motion, a bill of exceptions was signed by the presiding judge, from which

it appears that the applicants for new trial offered evidence tending to show that the bill of exchange, on which the original judgment was founded, was a transaction for the borrowing of money ; that only the sum of $23,000 was paid for said bill of exchange ; that said Benajah S. Bibb and William C. Bibb were only accommodation drawers of the same. It also appeared that the judgment sought to be opened for new trial was one rendered in a court of the rebel government, set up in the State of Alabama after the 11th day of January, 1861 ; and that Benajah S. Bibb was a Union man, and resisted the insurrectionary movement for a separation of this State from the Union up to the passage of the ordinance of secession, but after that he acquiesced in the action of the convention of the 7th of January, 1861, by which that ordinance was passed, and submitted to the rule of the insurrectionary government which that convention erected in this State, and aided in its support.

Upon this showing application is now made to this court for a rule *nisi* for *mandamus* to the circuit court, to compel that court to grant a new trial in said cause.

This application here renders it necessary to consider the effect of the ordinance No. 36 of the convention of the 5th of November, 1867, entitled "An ordinance to declare void certain judgments, and to grant new trials in certain cases therein mentioned," passed December 6th, 1867 ; and the act of the general assembly, entitled "An act to extend the time in which to open judgments and grant new trials in certain cases," approved October 10th, 1868.— Pamphlet Acts 1868, pp. 186, 259.

There can not, now, certainly be any doubts as to the power of the legislative department of the government to pass a law authorizing the opening of judgments and the grant of new trials. This has been an authority uniformly exercised by the government of the State from its commencement, and has never, so far as I know, been seriously questioned.—Akin's Dig. p. 283, § 135 ; Clay's Dig. 340, § 150 ; Code, § 2407, 2408 ; Pamphlet Acts, 1857–1858, p. 39, No. 39 ; Revised Code, §§ 2813, 2814, 2845, 2827 ; *Ex parte Norton & Shields*, January term, 1870.

The convention of the 12th of September, 1865, seem to have entertained no scruples nor doubt on this right of the legislative branch of the government. This ordinance is almost in the very words of the ordinance No. 36 above referred to.—Revised Code, pp. 58, 59, No. 26, § 1. This power is one without any constitutional restriction.—*Calder v. Bull*, 3 Dall. 386; *Crawford v. Br. Bank Ala.*, 7 How. 279.

A new trial is a part of the remedy, and it has existed from the earliest times, and over this branch of practice the legislature of the State, unless the State constitution limits its authority, has the amplest power.—2 Bouvr. L. D., *new trial*, p. 210; 1 Sellor's Pr. (1813) p. 463; *Sturges v. Crowningshield*, 4 Whea. 122, 200. The granting of a new trial does not impair the obligation of a contract on which the judgment may be founded; if it did, no new trial could ever be granted. But this is contradicted by the practice of the States, and sanctioned by the highest judicial tribunal of the nation.—*Balt. & Susq. R. R. Co. v. Nesbit*, 10 Howard, 395. The ordinance No. 30, above cited, which is affirmed and adopted by the act of the general assembly, also above cited, does not grant the new trial as was done in *Calder v. Bull, supra ;* but it commands that it shall be done, if the application is made to the proper court in the manner and time directed in the act and ordinance. In the case at bar this has been done.

Controlled by the authority above referred to, I have no doubt of the constitutionality of the ordinance No. 36, and the act of the legislature confirming and adopting it. Both are wholly free from all constitutional objections, so far as the allowance of new trials is involved.

It remains, then, to inquire whether the facts submitted to the court below were sufficient to justify the opening of the judgment and the grant of a new trial.

In the first place, the judgment is that of an illegal court. The clerk who issued the writ, the sheriff who served it, and the judge who gave the judgment, so far as this court can know, were all mere usurpers, who did not hold their offices by color of any rightful authority. The court was not that of a State of the Union, and the government of

which it formed a part, was not that of a State of the
Union. The judge who presided in it was not a judicial
officer, recognized in this court, or by the rightful govern-
ment.—*Chisholm v. Coleman*, January term, 1869. The
government and the court in which this judgment is pre-
sumed to have been rendered was a foreign affair.—*Scott
v. Jones*, 5 How. 343, 377. No such foreign court could be
rightfully set up in this State. There was no law or treaty
to authorize it. No citizen of this State was bound, in law,
to answer to its summons or plead to its process. For the
reasons above shown, it was wholly destitute of any au-
thority as a legal court.— *Glass v. Schooner Betsey*, 3 Dall.
6; 10 Bac. Abr. p. 374, *verb void;* 3 Blackstone's Com.
24, 25. The whole proceeding was utterly void, as though
it had never taken place, unless validity is given to it as a
decree of a court of a government illegally and unconsti-
tutionally erected in a State of the Union. To give legal-
ity without legislative assistance to such a tribunal, is to
give legality to the insurrection itself—to give legality to
treason against the government of the United States.
*Shortridge & Co. v. Macon*, Pasch. Annotated Constitution,
p. 212. To recognize the sentence of this court as legal
is to recognize the court as legal, and the government of
which the court formed a part as legal; for they all cling
together as a whole. But this can not be. The entire cur-
rent of decisions from *Scott v. Jones* to *Texas v. White*, de-
nounce such a government as utterly void in all its depart-
ments, without legislative affirmance and ratification.—
*Texas v. White*, 7 Wall, 700 ; *Luther v. Borden*, 7 How. 1;
*Scott v. Jones*, 5 How. 343 ; *Glass v. The Betsey*, 3 Dall. 5 ;
*Shortridge & Co. v. Macon*, Paschall's Ann. Const., p. 212.

And the congress of the United States, and the chief of
the highest executive department of the nation, have done
the same.—Acts of Congress, Stat. March 2, 1868, Pamph.
Acts, pp. 90, 260 ; Stats. at Large, p. 14, ch. 30 ; President
Johnson's proclamation, 1865. Those emphatic declara-
tions of the illegality of the rebel government, erected in
this State during the late insurrection against the govern-
ment of the United States, have never been taken back or

modified, either by the Federal or the rightful State government; and this court, and all the courts of the nation, are bound to be governed by them. They are the only law upon the subject known to this court and must govern here, unless their validity is disputed. The attempt to incorporate and engraft into our law the European system of *de facto* governments, and the consequences which flow from them, has been wisely and emphatically repudiated, by the venerable head of this tribunal in his very learned and unanswerable opinion, delivered at the first session of this court, under its present organization, in the case of *Chisholm v. Coleman*, in which, as I think, that doctrine was properly denied acceptance here, and repelled as inapplicable to our system of governments, and to the peace of the country. It is the offspring of insurrection, and calculated to encourage them. There can be no doubt about the power of the legislative departments of the government of the Union, and the rightful and legal government of the States, to validify by law of their own enactment, whatever it may be wise and proper to make good after the suppression of a rebellion against the sovereignty in the States, or within the territories of the Union. The law-making power is wisely lodged with them alone. And it is by the laws of their enactment that the land must be governed. Laws can neither be enacted nor imported by the courts, however strong their suppositions of their necessity may proclaim their want. I therefore think that to enable any government, erected in a State of this Union, to enact valid laws, or its courts to render valid judgments, it must be a legal State government, and must be acknowledged by the congress of the United States as such; otherwise, all its acts, and the acts of all its courts are utterly void, and they can only become valid by the affirmance and ratification of the rightful legal government in its restoration to power, or by the rightful government of the nation, as the question may be one of domestic or national import. In this State necessity may be pleaded to excuse an individual act, otherwise unlawful, but it can not be pleaded to validify a law or a judgment of an incompetent authority.

That which is illegal remains illegal until the law removes its illegality, and laws can only be passed by the agency which is clothed by the fundamental law of the State, or of the Union, with that great right. This is a principle which forms the very basis of all our State governments. And as a great jurist and statesman has said, upon another occasion, "doubtless the continuance of regulated liberty depends on maintaining this principle."—(*Daniel Webster.*)

To depart from this is to turn over to the courts a portion of the legislative power of this State—the power to say what laws and what judicial acts of an illegal government shall have effect, and what shall not have effect. Such power the courts are expressly forbidden to exercise. Con. Ala. art. 3, §§ 1, 2; art. 6; art. 5.

This judgment, then, was *coram non judice*, and does not bind the defendants, even as the judgment of a foreign court, because it was not a court of a government acknowledged by the rightful political authority.

Another question occurs in connection with this case. It is this—has this judgment been made good, ratified or affirmed, in any manner by the rightful authority of the State, or of the general government? I think it has not. All the departments of the government are mere agencies. Cooley, 87, *et seq.*, and notes. They are depositories of special and separate powers of administration, and the one can not perform the agency entrusted to another.— *Waymay v. Southard*, 10 Whea. 46.

And as it is with other agencies, what one agency is forbidden to do in the first instance, it can not ratify, if done in the name of another, by an illegal authority, or rather, by another agency wholly void. The legislative agency can not make a judgment good which has been rendered by a void and illegal court, unless it could have conferred authority upon such void court to have given the judgment in the first instance. But this the legislative authority has no power to do. This was a judgment by a circuit court. The legislature has no power to make circuit courts, nor to give the judgment of a circuit court. Then such a ratification would be void for want of authority to make it. Cooley on Const. Limit. p. 108, and notes; *Denncy v. Mat-*

*toon,* 3 Allen, 361 ; Story's Agency, §§ 240, 241, and notes. Here the judge was an intruder. His right of jurisdiction was founded on no legal authority whatever, and the judgment falls for want of legal authority in the court. This the legislature can not supply. *Debile fundamentum fallit opus.*—Broom's Max., p. 80, marg. In this case the legislature has done all it can do. It accepts the proceedings in the rebel courts as a basis for an application for a new trial.

The ordinance No. 26, of the convention which assembled at the capitol in the city of Montgomery, in this State, on the 12th day of September, 1865, not being in conformity with the principles of this opinion, is, as a legislative act, illegal and void, so far as this case is concerned ; and the decision in *Randolph v. Baldwin,* which is founded upon it, is overruled.—Revised Code, p. 58 ; *Randolph v. Baldwin,* 41 Ala. 305.

It is contended that the judgment in this case is founded on a contract for the loan of money. If this be admitted, then that contract was usurious. The sum of $23,000 was received· in the bill of exchange, and $2,000 were to be paid for the use of it for one year. This was above the rate fixed by law. Under such a state of facts, the judgment should have been only for the sum loaned, and without costs.—Revised Code, §§ 1831, 2781. Yet the recovery was for $27,609.65 and all costs. This was $4,609.65, and all the costs, too large. Under this hypothesis a new trial should have been granted.

Besides, the complaint alleges that the bill of exchange was "duly protested, of which the defendants had due notice." This is not surplusage and should have been proved, or the complaint amended to suit the true state of the facts. But at the date the bill matured it is more than probable that there were no legal officers of the rightful government of Alabama in power in this State, and it would not have been permitted to the defendant, Benajah S. Bibb, who was a Union man, to have alleged or contested this question in the so-called court in which this judgment purports to have been rendered, without peril to his life or liberty.—Hon. C. C. Sheats' case. It is, there-

fore, almost certain that he could not have made the same defenses in that court that he could have made in the courts of the rightful government. This is an additional reason, not without much force, for the grant of a new trial in the court below.

I therefore think, for all the above reasons, and under the facts of this case, that a rule *nisi* in conformity with the prayers of the applicant's petition, ought to be granted.

The grounds relied upon in this suit should justify the allowance of an application for a new trial upon very slight showing.

This is an application for *mandamus*, and it invokes the exercise of the original and plenary powers of this court. They are derived from the second section of the 6th article of the constitution of the State, which is in these words :

"Sec. 2.   Except in cases otherwise directed in the constitution, the supreme court shall have appellate jurisdiction only, which shall be co-extensive with the State, under such restrictions and regulations not repugnant to this constitution, as may from time to time be prescribed by law ; *Provided,* that said court shall have power to issue writs of injunction, *mandamus, habeas corpus, quo warranto,* and such other remedial and original writs as may be necessary to give it a general superintendence and control of inferior jurisdictions."—Con., art. VI, § 2.

From this it will be seen that it is only the appellate jurisdiction of this court that is subject to legislative control ; but the power to grant the several writs above mentioned, and to superintend and control inferior jurrisdictions, is inherent in the court by constitutional grant with which the legislative department has no authority to interfere. Then, in the exercise of these powers, the practice of the court becomes the law of the court.  These powers rest upon the same basis that the separate and original powers of any other department do, upon a grant by the people— the sovereigns—to the court, by constitutional provision. Under these powers, in the performance of the duties arising out of them, the court proceeds according to its own discretion.  But this discretion is not to be a reckless and unreasonable discretion, but such as shall lead most certainly

to the accomplishment of the highest justice, and the enforcement of the laws.

Under this construction of the powers of the court, thus derived, in the progress of this cause at the bar, an order has been granted in favor of the applicant, Benajah S. Bibb, to suspend the sale of his lands levied on under a writ issued on the judgment sought to be opened in this cause in the court below, in which the application was made. Under this order a writ was issued from this court, directed to the sheriff of the county who had possession of said writ of *fieri facias* for execution, to suspend a sale under said writ upon the conditions and for the length of time directed in said order.

This proceeding was necessary in order to afford this court proper time to look into a case of so much novelty and difficulty as this, and to secure the rights of the parties interested from further complication in a matter of so much uncertainty; and to give to the action of this court its proper effect in this case.

In such a matter there can be no reasonable doubt of the power of the court to control the action of the circuit court and all its officers, as an inferior jurisdiction, according to its discretion, and to construct its writs to suit the exigencies of the case before it, under the authority of the section of the article of the constitution above quoted, without legislative aid or interference.

Let the rule *nisi* be granted.

PECK, C. J.—I hold that the circuit court should have granted a new trial on the application of said B. S. Bibb *et al.*, on the judgment of Howell Rose against them, revived in the name of his executors, Hatchett & Trimble, and that an alternative *mandamus* should issue to require said court to do so. But this decision does not require this court to consider or determine the character of the judgments of the courts of the rebel States during the rebellion; whether valid, voidable, or void. I, therefore, concur with Justice Peters in the decision of the court just announced by him; and as it is unnecessary to go further, and determine the character of those judgments at this

time, I do not wish it to be understood that I concur with him in the argument and reasoning used by him on that subject; as to that question, I hold myself wholly and altogether uncommitted.

B. F. SAFFOLD, J.—I concur in the order of the court, granting an alternative *mandamus* to the judge of the circuit court to give the applicant a new trial in a case where judgment was rendered against him during the war, on the ground of meritorious defense, as provided in the third section of ordinance No. 39 of the convention of 1867.

But I dissent from so much of the opinion of Justice Peters as tends to declare void all of the acts of the government existing in the State during the war, for reasons given in my dissenting opinion in the case of *Hoffman v. Boon & Booth*, at the June term, 1869.