# Todd *et al. v.* Neal's Administrator.

### *Creditor's Bill to set aside Fraudulent Deed, and subject Property conveyed as Equitable Assets.*

1. *Foreign bill of exchange ; what law governs demand, protest, and notice.* — A bill of exchange, drawn in Alabama, on parties in Louisiana, and payable there, is a foreign bill (Rev. Code, § 1857), and is governed, as to demand, protest, and notice thereof, by the law of Louisiana.

2. *Notary public in Confederate States.* — The courts of this State, as now organized, will not recognize as valid the official acts of a notary public in New Orleans in February, 1862, assuming to act under the authority of the insurrectionary government then existing in Louisiana; nor will they recognize his official acts as those of a notary *de facto.*   (SAFFOLD, J., dissenting.)

3. *Protest by private person.* — If there is no legal notary at a place where a foreign bill falls due, the holder may have it protested by any respectable inhabitant of the place, in the presence of two witnesses, in the form required by the local law or usage of that place.

4. *Sending notice of protest by mail.* — When notice of the protest of a foreign bill of exchange is sent through the post-office, as authorized by our statute (Rev. Code, § 1850), it must be by the mails regularly established under the laws of the United States; and when such notice is sent through any other channel of communication (*e. g.,* through the mails of the Confederate States), it must be affirmatively shown to have been received by the person to whom it was addressed.

5. *Admission of notice of protest.* — An admission on acknowledgment, by an indorser, that he has received notice of protest, when made with a full knowledge of all the facts, is presumptive evidence of notice ; but it is not sufficient to charge him, unless there has been in fact a legal protest.

6. *Error without injury in admission of cumulative evidence.* — The chancellor's decree will not be disturbed, on error or appeal, on account of the improper admission by him of illegal evidence, when the record shows that there was sufficient legal evidence, not objected to, to sustain his decision.

7. *When creditor without judgment may come into equity.* — Under section 3446 of the Revised Code, which was intended to enlarge the former remedies in equity, and which should be liberally construed, a creditor at large may come into equity to set aside a fraudulent deed made by his deceased debtor, on alleging a deficiency of assets to pay debts.

8. *Fraudulent conveyance ; distribution of proceeds of sale of property.* — When a conveyance, executed by a deceased debtor in his lifetime, is set aside in equity as fraudulent, at the instance of creditors existing at the time of its execution, only those creditors who join in the bill can share in the proceeds arising from a sale of the property ; and if there is any surplus after satisfying their debts, it goes to the donees under the deed, and cannot be claimed by the administrator for distribution among the other creditors.

9. *Constitutionality of law authorizing appeals from existing judgments without security for costs.* — The act approved March 9th, 1871, which allows married women to take appeals without giving security for the costs (Session Acts 1870, 1871, p. 45), in its application to judgments existing at the time of its passage, does not impair the obligation of such judgments, or of the contracts on which they are founded, and is not unconstitutional.

APPEAL from the Chancery Court of Madison.
Heard before the Hon. WILLIAM SKINNER.

WALKER & BRICKELL, for the appellant.

[Todd *v.* Neal's Administrator.]

F. P. WARD, for the administrator of Geo. W. Neal, deceased, who was the complainant below.

ROBINSON & WALKER, for the administrators of Daniel B. Turner, deceased, who was one of the defendants below, and who here assigns cross-errors by consent.

(No briefs have come to the hands of the reporter.)

PETERS, J. — This is a suit in chancery. The bill was filed on the 21st day of April, 1868, in the Chancery Court of Madison County. The purpose of the suit is to subject certain real property, particularly described in the pleadings, to the payment of the complainant's debt, upon the ground that the property mentioned had been fraudulently conveyed to a third person, " with intent to hinder, delay, and defraud " the debtor's creditors, among whom the complainant was entitled to be numbered. It is also alleged that there were other creditors besides complainant. The bill is filed against the representative of Daniel B. Turner, deceased, the debtor, and the parties claiming under the conveyance sought to be set aside for fraud. It is alleged that the complainant's debt existed at the time of the making of said conveyance ; and that the property of said Turner, owned by him at the date of said conveyance, or at his death, was not sufficient to pay his debts ; and that since his death his estate had been regularly declared insolvent. And the amended bill also adds, in section 9, " that after exhausting all the other remedies and resources of your orator for the recovery of his said debt, there will remain due to him on the same a sum exceeding the value of the property sought in his said bill to be subjected to the payment of said debt." The property in controversy is a storehouse and lot in the town of Huntsville, in said County of Madison, estimated to be worth something less than $17,000 ; and the debt sought to be collected is evidenced by a bill of exchange, in the words and figures following, to wit : —

" Exchange for $8,147.84.

" MAYSVILLE, Ala., June 25th, 1861.

" Eight months after date first of exchange (second unpaid), pay to the order of F. L. Hammond eight thousand one hundred and forty-seven $\frac{84}{100}$ dollars, value received, and charge the same to account                    FLEMING JORDAN.

" To Bradley, Wilson & Co., New Orleans, La."

Indorsed : " F. L. Hammond, Huntsville, Ala."
                    " D. B. Turner, Huntsville, Ala."

" Pay to the order of Mess. Wood & Son.
                    " B. M. Lee, cashier."
                    " Wood & Son."

[Todd *v.* Neal's Administrator.]

The complainant sues as holder, and alleges that this bill of exchange was indorsed by said D. B. Turner, in his lifetime, and not being paid at maturity, was duly protested, whereof due notice was given to said indorser, Turner. The bill was demurred to, and the demurrer was overruled. And on the final hearing, the chancellor decreed the conveyance above referred to to be void for fraud, and ordered the property therein conveyed to be sold for the payment of complainant's debt. From this decree Mrs. Todd, who was the party interested in the conveyance, brings the case to this court, and assigns numerous errors, which are noticed below. The administrator of the estate of Turner also assigns cross-errors, which are also noticed below.

1. The questions mainly contested in the briefs of the learned counsel representing the parties in this court refer to the validity of the demand, protest, and notice of protest of the bill of exchange above recited, and the competency of the evidence relied on to prove said demand, protest, and notice to Turner, the indorser. The bill of exchange in this case was drawn in this State, and made payable at New Orleans, in the State of Louisiana. It is, therefore, a foreign bill of exchange, under our law (Rev. Code, § 1857; Story on Bills, §§ 22, 23, 24, 25; 1 Parsons on Notes & Bills, pp. 55, 58), and it is to be governed by the law applicable to such instruments. In such case, the law regulating the demand, protest, and notice of non-payment is that of Louisiana, the place where the bill is made payable, unless the parties have agreed upon some other. See Edw. on Bills, p. 177, note 7.

2. The protest and notice of protest in this case is in the form usual and permitted by the laws of the State of Louisiana. But it was made on the 28th day of February, in the year 1862, during the late Rebellion, and while the State of Louisiana was under the control of the insurgent power organized in that State for the support, aid, and comfort of the Rebellion. The protest is signed by "Theo. Guyol, notary public." To show Guyol's authority to act as a notary public, in the State of Louisiana, his deposition was taken by the complainant in the court below. On cross-examination, Guyol states that he held a commission as notary public in the parish and city of New Orleans, which was "dated prior to the 1st November, 1860, which had not expired in April, 1861, when he received another from Governor Moore;" and "that after secession he continued to act as notary, and that after secession he took an oath of office which was required, as it is now required from any one receiving a commission. He does not recollect whether he took an oath to the Confederate government; that it was to the State of Louisiana only; he was not required to take any other

[Todd *v.* Neal's Administrator.]

oath than the oath of office." Does this evidence show that Guyol was a legally authorized notary public of the State of Louisiana at the date of the protest in this case ?

The office of notary public in this country, like all other offices, is one which must derive its authority from the Supreme power ; that is, *the* PEOPLE, acting in some of the forms of law or constitution prescribed by themselves. There must be a power to create an office before it can exist ; and the person who assumes to discharge its functions must do so by virtue of an appointment by an authority competent to bestow it. An officer is one who is lawfully invested with an office. 7 Bouv. Bac. Abr. pp. 279, 281, B. It may be admitted that the Rebellion did not destroy the State of Louisiana, or repeal its laws as a State of the Union, or destroy any rights founded on its laws. The loyal and legal government of the State only was overthrown, and an illegal, disloyal, and treasonable government was set up in its stead. In the case of *Mauran* v. *Insurance Company*, Justice NELSON, referring to this *change*, says : " *We all* agree that all the proceedings of these eleven States, either severally or in conjunction, by means of which the *existing* governments were overthrown, and *new* governments erected in their stead, were wholly *illegal* and *void*, and *they (the States)* remained after the attempted separation and *change of government*, in judgment of law, as completely under all their constitutional obligations as before." 6 Wall. 13, 14. Again, in the case of *Texas* v. *White*, Chief Justice CHASE repudiates the validity of the legislatures and the legislative acts of these " new governments." He declares : " The Legislature of Texas, *at the time* of the repeal (1862), constituted one of the *departments* of a *state government* established in hostility to the Constitution of the United States. *It cannot be regarded, therefore, in the courts of the United States, as a lawful legislature, or its acts as lawful acts.*" 7 Wall. 731, 732. And in the later case of *Tyler* v. *De Frees,* Justice MILLER puts the legality of the Confiscation Act of Congress of July 17, 1862, upon the ground of its necessity to aid the national government, then involved in war with these " new governments," to preserve the Union. He says : " But we do not believe that the Congress of the United States, to which is confided all the great powers essential to a perpetual Union, — the power to make war, to suppress insurrection, to levy taxes, to make rules concerning captures on land and on sea, — is deprived of these powers when the necessity for their exercise is called out by domestic insurrection and internal civil war ; when *States*, forgetting their constitutional obligations, *make war against the nation*, and *confederate* for its destruction." 11 Wall. 345.

These declarations, which are uniform, and, I think, eminently just and proper, most obviously point to a state of affairs in the seceding States, of which Louisiana was one, which recognizes a *change* of their governments from those which *existed before* secession, to "new governments" which were *established after* that event. It is well known that these "new governments" were not matters of gradual development, but that they were organized, or "erected," immediately on the passage of the several ordinances of secession. In Texas, Governor Houston, the loyal and legal executive chief of that State, refused to acquiesce in the *change,* and he was deposed. 1 Harper's History of the Great Rebellion, p. 288. It is also well known that these "new governments" were established in hostility to the Constitution of the United States, and for the purpose of *confederating together* for the destruction of the nation. These "new governments" had this result in view, and they had no other purpose to accomplish. According to the uniform and most solemn declarations of the same high tribunal before the Rebellion, such governments were utterly null and void in all their departments, and their whole proceedings were destitute of legal efficacy, without ratification or affirmance by the legal authority. *Luther* v. *Borden,* 7 How. 1 ; *Scott* v. *Jones,* 5 How. 343.

The cases last above cited refer to instances of illegal governments, which were simply established *without authority of law.* They were not, as in the present case, also hostile and treasonable to the nation, and confederated together to destroy it. A like instance with these last cited illegal governments occurred in that part of North Carolina west of the Appalachian Mountains, in what is now called "East Tennessee." It occurred in 1785, when there was an attempt to establish the "State of Franklin." This attempt was pronounced illegal, if not treasonable towards the State of North Carolina, and it was supressed as such ; and its acts, and the proceedings in its courts, were not esteemed valid, until they were ratified and affirmed by the legislative enactments of the rightful government. *Ingraham's Heirs* v. *Cocke,* 1 Overton's Tenn. Rep. Cooper's ed. pp. 22, 23. The same was the case with Cromwell's government in Great Britain. 3 Atk. And a like course has been deemed necessary in this State. See Pamph. Acts 1868, pp. 186, 269 ; also, *Mosely* v. *Tuthill,* 45 Ala. 621 ; *Noble & Bro.* v. *Cullum & Co.* 44 Ala. 554 ; *Ex parte Bibb,* 44 Ala. 140 ; *Bibb & Falkner* v. *Commissioner's Court of Chambers County,* 44 Ala. 119 ; *Martin* v. *Hewitt,* 44 Ala. 418 ; *Chisholm* v. *Coleman,* 43 Ala. 204. President Lincoln also took a similar view of this *change* of the governments in the seceding States, in his proclamation of October 20, 1862,

[Todd *v.* Neal's Administrator.]

in direct reference to the State of Louisiana. In this he says: "The civil institutions of the State were subverted and swept away." *United States* v. *Reiter*, 4 Amer. Law Reg. p. 536.

No one pretends that there were two governments *existing* in the insurrectionary States *at the same time*, — that is, a *lawful* and an *unlawful* government. And no one pretends, except, perhaps, certain prominent actors in the Rebellion, that the " *new governments* " referred to by Justice NELSON were *legal* governments. It is a part of the history of the country, which courts are presumed to know, that the State of Louisiana passed what was called an Ordinance of Secession, purporting to dissolve the connection of that State with the other States of the Union, on the *twenty*-sixth day of January, 1861, and on the *fourth* day of February, in the same year, the delegates from that State joined those from South Carolina, Georgia, Alabama, Mississippi, and Texas, at Montgomery, in this State, and *confederated together* in forming the organization called " The Confederate States of America." 1 Harper's Hist. of the Great Rebellion, pp. 39, 41; Ann. Cyclop. (1861) pp. 428, 429. After this, Louisiana, under its new " government," actively participated in giving aid and comfort to the Rebellion until the final surrender of the insurgent forces. It seems to me, then, that it cannot be contended, with any proper regard for historical accuracy, that during this period this " new government," or any of its officers, were legally in authority. It was a government unknown to the laws of this State, and the laws and Constitution of the Union. *It was " a foreign affair*," — a *mere instrument of the Rebellion it had been established to promote ;* and its officers and acts are not entitled to comity or recognition in the courts of this State. *Chisholm* v. *Coleman, supra ;* also, 7 How. 1 ; 5 How. 343 ; *Cherokee Nation* v. *Georgia*, 5 Pet. 18. Then, *Theo. Guyol*, the person who protested the bill of exchange sought to be recovered in this suit, having been appointed to the office of notary public by Thomas Moore, the governor so-called of the State of Louisiana, derived no authority from such appointment to act in the office of notary public, which this court can recognize. His acts are not those of a legal officer of the legal state government of the State of Louisiana ; and it is not to be presumed, without proof, that Turner, as indorser of the security in controversy, agreed to be bound by any other protest than that made by a legal officer in the manner appointed by law.

It is true that the law of the contract enters into it, and explains its stipulations. But if the parties choose to go beyond this, they must make it a part of the contract by

agreement. Moore, being an illegal officer himself, of an ille gal and treasonable government, — a government confederating and making war to destroy the nation, — could not confer any legal authority on his appointee. It is true that the appointee's (the notary's) office was just as good as Governor Moore's, and no better. But Governor Moore, the rebel executive of the rebel state government in the State of Louisiana, was not such an officer as this court could recognize. *Chisholm* v. *Coleman*, 43 Ala. 204, and cases *supra*. After the overthrow of the " existing government," and the erection of the " new government," there was no legal government in the State of Louisiana. This was " suppressed and swept away." Government, in its executive sense, consists of its offices. Where there is no legal government then, there can be no legal offices, and no one to appoint functionaries to such offices. Governor Moore himself was wholly without authority, and he could not bestow that which he did not possess. He was not the representative of the sovereign power. He was at war with it, and seeking to overthrow and destroy it. *He was merely the agent of force and treason.* To set up his authority as legal, is against the public policy of the nation, and against law. For the courts to attempt this, without legislative aid, seems to me but a perilous indorsement of the Rebellion itself. Then, if Moore's authority was vain, his appointee's was equally vain. The stream cannot rise above the fountain. Where there is no power, none can be given. *Ex nihilo nihil fit.* Then, the protest and notice by Guyol as a notary public, as shown in the evidence, were not sufficient to bind Turner, the indorser.

But it is insisted that, if Guyol's appointment was illegal, yet he was a notary *de facto*, and, as such, his acts as such ought to be sustained. If this is true of Guyol, it is equally true of Governor Moore, who appointed him, and of all the officers so-called, of the Confederate organization. In the case of *Chisholm* v. *Coleman*, 43 Ala. 204, this court expressly refused to give such validity to the Rebellion as this must necessarily lead to. Before there can be an officer *de facto*, there must be a government known to the court of which the office is a part, and the functions of which the party acting is seeking to perform. Where the government is illegal, and forbidden by the Constitution of the nation, and the office is a function of such illegal government, and the appointment is by an illegal authority, I do not see how such a person can be brought into our courts, and his acts set up as valid acts, when the court neither knows him, his office, or his government, in any legal sense. Enough appears from Guyol's deposition to show that he was acting as Governor Moore's appointee in an office of the illegal government. Indeed, enough is known of the violence of the

[Todd *v.* Neal's Administrator.]

rebel government in Louisiana, to make it certain that he would not have been permitted to have acted in any other way. Not only this, but it was not allowed that any one in responsible position should acknowledge the authority of any other government, save that of the insurgent power, without incurring the danger of expulsion from the State, imprisonment, or personal destruction. Ann. Cyclop. 1862, pp. 553, 554. Such violence, doubtless, finds its excuse in the terrible exigencies which accompany an attempt to destroy a powerful and a good government. I do not think, then, that Guyol's acts are entitled to the credit of a notary *de facto*.

3. The holder of a bill of exchange is not bound to rely on the agency of a notary public, in order to have his bill protested upon its dishonor, though this is the most usual and convenient practice. If there be no *legal* notary, then, on demand and refusal of payment, it is sufficient, if the protest be made out and drawn up by a respectable inhabitant of the place where the bill is payable in the presence of two witnesses ; and it should be made out and drawn up in the form required by the law or usage of the place where it is made. Story on Bills, § 276 ; Kyd on Bills, pp. 136, 137 ; Chitty on Bills, pp. 362, 363 ; 2 Parsons on Notes & Bills, p. 633 ; *Burke* v. *McKay*, 2 How. 66. The bill of exchange in this case does not appear to have been protested in this latter form, but the holder relies solely on the protest of the illegal notary. Such reliance is insufficient to sustain his case. The protesting officer or person must have legal authority to act. Rev. Code, § 1089. This Guyol did not have.

I am aware that certain members of the National Judicary have intimated opinions, in one or two cases, which seem to militate against the conclusion above announced ; but these intimations have had no solemn recognition by the whole court of last resort. Until this is the case, I do not feel bound to follow them, however eminent the source may be from which such intimations come.

4. The question as to the notice of protest may be briefly answered. There was no proof of any actual attempt to give notice, except by a deposit of a copy of the protest made by Guyol, in the post-office at New Orleans, in the State of Louisiana, on the next day after the protest was made. This was in time, and if the mails had been then carried by the regular contractors and mail agents of the government of the United States, this would have been sufficient evidence of notice to fix the liability of the indorser Turner, whether he received the notice or not, provided Guyol's protest was valid. Rev. Code, § 1850 ; *Green* v. *Farley*, 20 Ala. 322 ; 1 Parsons on Notes & Bills, pp. 508, 613. *Bussard* v. *Levering*, 6

[Todd *v.* Neal's Administrator.]

Wheat. 102. The "mail" referred to in the Revised Code is the regular legalized mail of the government of the United States. No other mails, as applicable to the states of the Union, were known at the adoption of this law. None other, then, could have been intended. The intention of the law makes the law. The "Confederate mails," or mails of the rebel organization, were merely mails so-called. The attempt to send a notice by such a mode of conveyance is not sufficient under our statute, unless it appears that it was actually carried. If the notice was actually sent forward to the indorser, with due and proper diligence, this would be sufficient, regardless of the mode of conveyance. But, under our statute, the notice must be sent by the regular and lawful mail of the government of the United States; because it is to be presumed that that mail is carried forward with all proper and due diligence, under penalties and authority of law, to enforce its rapid and safe transportation. This cannot be presumed of the *Confederate mails*. It must, therefore, be shown by competent proof. That has not been done in this case. A failure to do this discharges the indorser. *Rives* v. *Parmley*, 18 Ala. 256; Story on Bills, §§ 381, 382, 383, and cases cited; 1 Parsons on Notes & Bills, p. 516, and cases in notes.

5. The complainant in the court below also relies upon the admission of Turner; to show that he had notice of the protest of the bill of exchange in this case. Turner admitted that he was largely indebted, and he referred to the claim in this suit as a part of his indebtedness. It is true such acknowledgments are presumptive evidence of notice of protest, when made under a full knowledge of all the facts, where there has been a legal protest. Story on Bills, § 320. But such admissions must be preceded by a *legal* protest, before they can avail anything against the indorser. In this case, no such legal protest has been shown. The confession of indebtedness was, therefore, insufficient to prove notice of protest, which would bind Turner or his estate. *Billgery* v. *Branch & Sons*, 8 New Series American Law Register, 334, 349.

6. The objection to the evidence of the insolvency of Turner's estate, as shown by the proceedings and decree of insolvency in the Court of Probate, need not be determined in this opinion. There was other evidence, which was abundantly sufficient, without this, to show that Turner was largely indebted at the making of the deed complained of; in truth, that the deed conveyed quite all his visible and valuable estate. The evidence of the insolvency afforded by the decree was merely cumulative, and there was, so far as this point in the case was involved, sufficient other evidence, unobjected to, to sustain the chancellor's determination. When this is the case,

[Todd v. Neal's Administrator.]

this court will not reverse, for such an error, admitting it to be one. See *Goodrich* v. *Goodrich*, 44 Ala. 670. This objection, for the present, is therefore pretermitted and left open.

7. The objection raised by the demurrer, that the bill is without equity, cannot be sustained. Besides the special grounds of equitable relief enumerated in the Revised Code, the powers and jurisdiction of courts of chancery extend to such other cases as may be provided by law. Rev. Code, § 698. A further section of the Code directs that " a creditor without a lien may file a bill in chancery, to subject to the payment of his debt any property which has been fraudulently transferred, or·attempted to be fraudulently conveyed by his debtor." Rev. Code, § 3446. This statute is intended to enlarge the former remedies in equity, and it should be liberally construed. The case stated in the complainant's bill clearly comes within the purview of this statute. In substance, the bill alleges that the complainant is a creditor of Turner, and that Turner had made a fraudulent conveyance of his property to certain of the defendants in the court below, and that there is a deficiency of effects of Turner's estate to pay his debts. This is sufficient. *Crawford et al.* v. *Kirksey et al.* June Term, 1872, head-notes, p. 20.

8. I will now dispose of the cross-assignment of errors made by the administrator of the estate of Turner, deceased. He contends that the conveyance assailed by the complainant Neal, in the court below, ought to be set aside and decreed to be void, and that the property therein conveyed, or the moneys into which it may be converted by a sale, ought to be decreed to him, to be administered by him as assets of said estate for distribution under the decree of insolvency, which has been rendered in the conduct of his administration of said estate ; and he assails the chancellor's decree, because it fails so to order and adjudge. It is not pretended that Turner's conveyance, which is assailed by the bill, is not good as against Turner himself, and all the world *except creditors*. The deed was made long before Turner's death. It passed all his title, in law and in equity, to his donees, at its delivery. At his death, then, Turner had no title whatever to the property thus conveyed, and nothing passed to his representative. It was not, and could not become, assets in the administrator's hands. If no creditor interferes, no one else could disturb the title of the owner under the deed of Turner. Assets are described to be " all those goods and chattels, actions and commodities, which were of the deceased, in right of action or possession, as his own, and so continued to the time of his death, and which after his death the executor or administrator doth get into his hands, as duly belonging to him in right of his executorship or

[Todd v. Neal's Administrator.]

administratorship; and all such things as do come to the executor or administrator in lieu, or by reason of that; and nothing else shall be said to be assets in the hands of the executor or administrator, to make him chargeable to a creditor or a legatee." Shep. Touchstone, p. 496. This definition, somewhat extended, is approved by Williams in his work "on Executors." 2 Wm. Ex. p. 1176, marg. But the property mentioned in this case does not come within the description of any of these instances. Our statute simply makes "the whole property of the decedent," real and personal, save certain exceptions named in the law itself, liable for the payment of his debts. Rev. Code, §§ 2060, 2061. The property here in dispute cannot be said to be any part of "the whole property of the decedent," because he had parted with his title before his death. But the law, in favor of the creditors of the donor in such a conveyance, makes the person who receives the property thus conveyed a trustee of such of the creditors as are entitled to claim it, and do claim it, for the payment of their debts, provided the conveyance is fraudulent as to them; that is, provided it is a conveyance made to hinder, delay, or defraud creditors. Rev. Code, § 1865. And this trustee of the creditors can be brought into a court of chancery, where the trust will be administered for the benefit of the creditors entitled to complain, and who do complain, but not for the benefit of the estate. Rev. Code, § 3446. If there is a residue of the fund left after the complaining creditors are paid, it belongs to the donees in the conveyance, and not to the representative of the estate. See *Marler, Adm'x*, v. *Marler*, 6 Ala. 367; *Osborne* v. *Moss*, 7 John. 161; also *Moody, Adm'r*, v. *Fry et al.* 3 Humph. 567; *Winn* v. *Bennett*, 31 Miss. 653; *Whitney* v. *Freeland*, 26 Miss. 481; *Henriques* v. *Hone*, 2 Edw. Ch. R. 123. I think, therefore, that the funds raised from such property are trust funds for the benefit of complaining creditors, and for no one else; and the Court of Chancery being rightfully in possession of the administration of the trust, should go on and finish it, as the law requires. *Blakey's Adm'r* v. *Blakey's Heirs*, 9 Ala. 391; also *Lucas* v. *Atwood*, 2 Stew. 378; *Pharis* v. *Leachman*, 20 Ala. 662; *Watts* v. *Gayle & Bower*, 20 Ala. 817; *State Bank* v. *Ellis*, 30 Ala. 478; *Quarles* v. *Grigsby*, 31 Ala. 172. Under this view of our law, the cross-assignment of errors cannot be sustained.

Before proceeding to dispose of the appellee's motion to dismiss the appeal in this case, I will take occasion to say that no opinion is intended to be given upon the validity of the conveyance involved in this case.

9. The motion to dismiss may now be disposed of. It cannot be sustained. Where appeals and writs of error are allowed,

[Todd *v.* Neal's Administrator.]

no judgment can be said to be absolutely final, until the time for taking the appeal has elapsed. The decree in this case bears date February 18, 1871, and the register's certificate shows that the appeal was taken on the 25th day of March of the same year. This was in time to exclude the Statute of Limitations in such a case. Rev. Code, § 3508. This was after the passage of the law entitled " An act to prescribe the terms on which married women may take appeals to the Supreme Court, and the effect of such appeals," approved March 9, 1871. Pamph. Acts 1870, 1871, p. 45. The appellee assails this law as invalid, because it impairs the obligation of contracts ; and cites *Weaver* v. *Lapsley* (43 Ala. 224), as the authority on which he relies to sustain his ground of motion. The appeal does not assail the validity of the judgment of the court below, nor the contract on which it is founded. It is but a continuation of the suit, as to certain questions in litigation in another court. There is no stipulation in appellee's contract that the right of appeal shall be denied to the appellants. If the local state legislature chooses to direct by statute how appeals shall be taken, this must necessarily be the law of appeals in the local courts. It is a matter of practice. It is the mode of transmitting a cause from an inferior to a superior court. It is a matter under the government of the state legislature. It has nothing to do with the contracts litigated in the state courts. It is merely a mode of ending the litigation. It leaves the contract, that may be the foundation of the suit, wholly without any impairment of its obligation whatever. That the appellant shall give bond to secure the costs of appeal, is a mere regulation of the practice by statute. Such a statute may be repealed. It takes away from the appellee no vested right. Cooley's Const. Limitations, p. 361, and cases cited in notes ; also *Anonymous*, 2 Stew. 228 ; *Page & Wife* v. *Matthews*, 40 Ala. 547 ; *Curry* v. *Landers*, 35 Ala. 280. The motion to dismiss the appeal is therefore overruled with costs.

And finally, from the principles above announced, the appellee is not entitled to recover. The decree of the court below is reversed, and the cause is dismissed out of this court at appellee's costs ; and the decree of this court will be so entered.

NOTE BY REPORTER. — On a subsequent day of the term, in response to an application for a rehearing by the counsel of the complainant below, the following opinion was delivered : —

PETERS, J. — This case was very carefully considered in the opinion heretofore delivered. The rehearing is but an application to go over the same grounds, without any new light

[Todd *v.* Neal's Administrator.]

upon the subject, which, in my conception of the merits of the case made in the bill, would justify any change in the result. The argument on which the opinion is based cannot be mistaken. It is unnecessary to repeat it. The commerce between the states in rebellion ought to have been forbidden. It is well known that large supplies of " meat and bread and munitions of war " were obtained from the State of Kentucky for the use of the rebel armies. It is said by a very competent authority, that " the capture of the *stores* at Manassas Junction and Harper's Ferry, and the *spoils* taken from Kentucky, were of immense service to the cause," that is, the Rebellion. In 1862, it was said by the Confederate leaders, " there are more hogs and cattle in Kentucky, available for general consumption, two or three to one, than are now left in all the South besides ; and steps ought to be taken by the government " (insurrectionary) " to drive those animals, as well as mules and horses, as the armies march forward, and place them within our lines. It is not only positively important to us " (the rebels) " that these animals should be promptly secured as they fall within our grasp, but it is negatively so also, in depriving the enemy " (federals) " of the convenient supplies of meat for the army, which they have derived from Kentucky." Ann. Cycl. 1862, p. 250, Art. *Confederate States.* It is very evident that these indispensable " munitions of war " could be just as easily moved from one rebel state to another, by commerce, as they could by an army, and much more cheaply. All such commerce was of evil policy. It could be carried on by bills of exchange, which, as indispensable facilities of commerce, contributed to prolong the war of the insurrection. And as such commerce between the states in rebellion was an instrumentality calculated o be abused, to the injury of the government, it was inimical to the public policy. I therefore still think, that the illegal state government of Louisiana during the Rebellion should be utterly ignored in our courts, and all the acts of its commercial agents should be rejected. This has been done in this case. This is in accordance with the true theory of our government, and I am unwilling to abandon it. *Billgery* v. *Branch & Sons,* 8 Am. Law Register, 1869, pp. 334, 349 (New Series).

I cannot consent to any modification of the judgment of this court in this case. It is clearly inequitable to reverse and send the case back, to allow the complainant below the opportunity to speculate in the chances of a new trial, when it is clear that the cause does not justify it.

The rehearing is denied, with costs.