## NOBLE & BRO. ET AL. *vs.* CULLOM & CO. ET AL.

[CONTEST AMONG JUDGMENT CREDITORS OVER APPLICATION OF MONEY MADE
UNDER EXECUTION.]

1. *Submission of cause; when will not be set aside.*—After assignment and joinder in error, and the submission of a cause in this court, the revoking of the order of submission is a matter of grace, resting within the discretion of the court. A motion to set aside the order of submission by one of the parties in a cause, will not be granted, when it may work injustice to the other parties.

2. *Distribution of money collected on fi. fa.; what judgments have a preference.*—On a motion to distribute a sum of money collected by the sheriff on *fi. fa.*, on several judgments, some of which were rendered in a circuit court of this State before the 11th day of January, 1861, and others rendered in the courts of the rebel State government, the judgments of the rebel courts will be postponed in payment to the judgments rendered by the courts of the State before secession.

3. *Quere.*—Are not judgments of the rebel courts, rendered in this State during the supremacy of the rebellion, mere nullities?—(*Per* PETERS, J.)

4. *Persons holding office, after passage of ordinances 3 and 10 of convention of 1861, how regarded.*—All persons holding office in this State, after the overthrow of the rightful government thereof, by the late rebellion, and after the passage of the ordinances Nos. 3 and 10 of the convention of 1861, are to be regarded as persons holding office under the insurrectionary organization, then having military control of the territory of the State.

5. *Same; judgments of courts of insurrectionary organization, how regarded.* This insurrectionary organization was erected in defiance of the public policy and constitution of the United States, and the judgments of its judicial tribunals are not such as this court, in the absence of legislative enactments, has authority to recognize and enforce, except, perhaps, as the decrees of foreign courts. (Chief-Justice, *arguendo* in *Martin v. Hewitt.*)

6. *Same; what not made valid by.*—The judgments of the courts of the so-called Confederate government, erected in this State during the supremacy of the late rebellion, were not ratified and made valid by operation of the reconstruction acts of congress.

[SAFFOLD, J., *dissenting, held*—1. In cases of successful or subdued rebellion, or when one independent nation succumbs to another, the courts of the conquering government, in the absence of positive legislation, are bound to recognize the rights and obligations of the vanquished people between themselves, as prescribed and determined by their local laws and tribunals, except so far as they militate against the laws and institutions of their own country. 2. In a practical sense, the people

and the government of Alabama, before, during, and since the rebellion, are identical. The participators in the rebellion were alone amenable. Their ordinance of secession was simply void.  3.  The laws and judicial decisions of the rebel government of Alabama have been expressly validated by the legal State government, except so far as they were in violation of the constitution and laws of the Union, or of the State.]

APPEAL from the Circuit Court of Montgomery.

Tried before R. M. WILLIAMSON, Esq., an attorney of the court, under § 758 of the Revised Code.

This cause grew out of a motion of the sheriff, for the direction of the circuit court as to the application of moneys collected by him, on various executions issued on judgments rendered by the "county court," afterwards "city court," and the circuit court. The various parties interested appeared and contested with each other the right to the moneys collected. The dates of the rendition of these judgments, and the facts upon which the decision is based, will be found therein.

RICE, SEMPLE & GOLDTHWAITE, and CHILTON & THORINGTON, for appellants.

MARTIN & SAYRE, and ELMORE & GUNTER, contra.

PETERS, J.— In this suit, a motion is made to set aside the submission of the cause for the consideration and judgment of this court, which seems to have been made at the same term that the transcript was filed.

The grounds of this motion are—that the cause has been irregularly brought into this court; that it has been brought here by consent, and not by appeal in the regular way prescribed by the statute. No doubt that this court may take jurisdiction of the subject-matter of this suit. It appears that the transcript was filed in this court, on the 16th day of June, 1868, and that errors were thereupon regularly assigned in the names of Noble & Brother, and Mary Mastin and William A. Graham, as executors of the last will and testament of Peter B. Mastin, deceased, by Chilton & Thorington, and Rice, Semple & Goldthwaite, their respective attorneys. And at the same term, the appellees, Wil-

liam O. Baldwin, by his attorneys, Martin & Sayre, and Smith Cullom & Co., by Martin & Sayre, their attorneys, joined in the errors thus assigned. And thereupon the cause was submitted on briefs, at the same term, for the judgment of this court. It is also known to the court, that the distinguished practitioners, above named, were, at the time of the assignment and joinder in error, as above shown, attorneys of this court. Under this order of submission, this case came into the hands of the present court, and has been held under advisement until the present term.

The motion to set aside the submission heretofore made in this case, is denied, because it violates the agreement of the parties upon bringing the case into this court, which is filed with the transcript, and it would operate as an injustice and surprise upon the other litigants adversely interested, who relied upon this agreement. The revoking and setting aside of the order of submission is a matter of grace, and not a matter of right, and it rests in the discretion of the court to grant it, or to refuse it. In such a case, the court will never exercise its discretion so as to injure one party, who may have been betrayed by the seeming bad faith of another. Such has been the practice of our predecessors in this tribunal, and we think it sufficiently well sustained by reason and authority.—*Br. Bk. Decatur v. McCullum*, 20 Ala. 270 ; *Thompson v. Lee*, 28 Ala. 453 ; 3 Chitty Gen. Pr. 55, 56, marg.

The appellants will pay the costs of this motion, to be equally divided between them; the appellants, Noble & Brother, one-half, and the executors of Peter B. Mastin, deceased, one-half.

This motion having been disposed of, we turn to the principal case. The transcript shows, that the only cause in this court is the controversy from the circuit court of Montgomery county upon the procedings in that court in the nature of a suit of interpleader between William O. Baldwin as one party, Smith Cullom & Co. as another party, Noble & Brother as another party, and the executors of the last will and testament of Peter B. Mastin, deceased, as another party, to ascertain which of these several par-

ties was entitled to a certain sum of money which had been collected by the sheriff of said county of Montgomery, by sale under certain executions in his hands, which had been issued on certain judgments in favor of the several parties above named, as plaintiffs, against Thomas H. Watts, as defendant; which judgments are each more particularly described below.

The proceedings in the city or county court could not be joined in the same appeal with the proceedings from the circuit court. We can not, therefore, regard these former proceedings, except as evidence offered on the trial in the circuit court. Neither could the judgments on the motions to amend the sheriff's returns be made a part of this appeal. This proceeding only brings up the judgment on the interpleader. The judgments on the motion to amend the several returns on the *fi. fa.* were final and must be separately appealed from; but as evidence they can not be collaterally impeached.—29 Ala. 92; *Creswell et al. v. Comm'rs Court*, 24 Ala. 282; *Davis v. Calhoun*, 24 Ala. 437.

Then, waiving further discussion of these questions, the case narrows itself, in effect, down to the judgment in the interpleader suit, as to the right to share in the distribution of the money made on the sheriff's sale by authority of the *fi. fa.*, as shown in the record. The circuit court gave judgment in the interpleader suit in favor of Baldwin on his motion, and also in favor of Smith Cullom & Co., on their motion against the sheriff, Johnson, who had collected the money in controversy; and refused to give judgment in favor of Noble & Brother, or in favor of the executors of Mastin, or in favor of Isaac O. Robinson, or in favor of the executors of Rose, each of whom claimed distribution of said funds, to them, on their judgments. But it appears, by the agreement of counsel filed with the record, and by the assignment of errors, that only Noble & Brother, and the executors of Mastin, bring the case to this court.

For the purpose of the disposition of the case in this court, it is only necessary to consider the judgments in favor of Baldwin, and also in favor of Smith Cullom & Co., and Noble & Brother, and also Mastin's executors. As Robinson and Rose's executors do not claim here, their

judgments will not be further noticed, except to state, that did they claim, their application would be determined on the same basis that fixes the fate of the claims of Noble & Brother and Mastin's executor, as these all stand upon a similar condition of facts.

The record shows that Baldwin obtained two judgments against Thomas H. Watts, in the circuit court of Montgomery county, in this State, on the 7th day of December, 1860; the one for $5,047 77, and the other for $6,057 33; that this latter judgment was paid off before the commencement of these procedings, except the sum of $311 05.

It also appears from the record, that Smith Cullom & Co. recovered judgment against said Watts, in said circuit court, on the 8th day of December, 1860, for the sum of $5,182 59.

On all these judgments executions of *fi. fa.* were regularly issued in favor of the respective plaintiffs therein, on the 24th day of December, 1860, and were delivered to the sheriff of said county, on the same day of their issuance, and so far as is shown by the record, at the same time. These executions were made returnable to the next following term of said circuit court, which should have been held in May, 1861. But before this period of return arrived, the ordinance of secession of this State from the Union was passed on 11th day of January, 1861, and said term of said circuit court was never held, the rebellion then prevailing in this State having suspended the lawful courts of the lawful State government of the State of Alabama. This court remained thus suspended until the rebellion was overthrown, and this State was restored to the rule of the rightful and lawful State government of the State, in legal union with the government of the United States. This period of restoration, this court has intimated, took place on the 25th day of September, 1865; as on that day, has been fixed the time from which the statute of limitations ceased to be suspended by the late war in this State.—*Holmes v. Coleman*, January term, 1870. It will, therefore, be unnecessary to notice anything that may have been done in the rebel courts in these cases, from the 11th day of January, 1861, until the 25th day of Septem-

ber, 1865, if that date has been properly selected and fixed as the precise date of the restoration of the rightful and lawful government of the State of Alabama. But I do not conceive that that point is necessary to be decided in this case. It will therefore be no further mooted in this opinion.

It is also shown by the record, that Noble & Brother recovered two judgments in a tribunal styled in the record the county court of said county of Montgomery, in the State of Alabama, on the 12th day of March, 1861, against the said Thomas H. Watts ; the one for $646 30, and the other for the sum of $1,229 30, and that executions of *fieri facias* were issued, on each of these judgments, on the 25th day of March, 1861.

The record likewise shows that Peter B. Mastin, who was then living, but has since died, also recovered judgment in said county court aforesaid, on the 8th day of March, 1861, against said Watts and others, for the sum of $4,766 48, and that execution of *fieri facias* was issued thereon on the 25th day of March, 1861. After the death of said Mastin, said judgment was revived in the names of his executors, said Mary Mastin and said William A. Graham.

If these supposed judgments in favor of said Noble & Brother, and said Peter B. Mastin, are invalid, then this controversy, so far as they are concerned, is at an end. They have nothing to complain of, as they had no legal foundation to support their demand. Without a legal judgment, they had no right.

In the important case of *Chisholm v. Coleman,* 43 Ala. 204, the judgment of this court is based upon the assumption that a judge of one of the insurgent courts of the rebel government, in the State of Alabama, during the late rebellion, was not a legal judge of the legal and rightful government of the State of Alabama, and as such he was not entitled to be paid his salary for services rendered during the rebellion, by the legal and rightful State government of this State. If the judges of the courts of the insurgent government in Alabama, during the late insurrection, were illegal, then, also, the courts of the same government must

be illegal, as there can not be a legal court without a legal judge.—2 Bac. Abr. (Bouv.) 616, 618, 619. But the same disability which clung to the judge adhered to the court also. Both were illegal, and both vicious, because they constituted, in part, one of the departments of a "State government established in hostility to the constitution of the United States." What is in hostility to the constitution, is unconstitutional, and, therefore, utterly void.—*Texas v. White*, 7 Wall. 700, 732; *Dodge v. Woolsey*, 18 How. 347; *Mauran v. Insurance Co.*, 6 Wall. 1, 13, 14; *Ex parte Milligan*, 4 Wall. 2; Cooley's Const. Lim. 3, 4; *Marbury v. Madison*, 1 Cr. 137, 180; 2 Dall. 308. But besides this, the legal and rightful sovereign power only can estab-. lish legal judicial tribunals. Usurpers and foreign sovereignties have no such power to do this.—*Snell v. Fausatt*, 1 W. C. C. 271; *Glass v. The Betsey*, 3 Dall. 6; *Bibb & Falkner v. Chambers county*, January term, 1870. If the contrary doctrine were true, then it seems to me, that the judgment in *Chisholm v. Coleman, supra*, can not be maintained. But it is the law. Again, the statute of limitations could not have been suspended during the existence of the late insurrectionary government in the State, except on the principle that there were no rightful and legal courts, in which suits might be commenced, or that the plaintiff was denied the use of such courts, as were found here. Otherwise, there was no sufficient legal reason for the suspension of the statute. Yet, this court has decided, that this statute was so suspended.—*Holmes v. Coleman, supra.* Upon any other principle, this judgment would seem to be an anomaly.—*Hanger v. Abbott*, 6 Wall. 532.

Following in the same train with these adjudications of our own courts, the supreme court of the United States has declared that "the Confederate States" government was not a legal government *de facto*—in effect, that it was, in point of law, an utter nullity; and that it could not give sanction to any rights.—*Hickman v. Betts et al.*, December term, 1869, of United States supreme court; *Shackelford v. Macon*, Pasch. Ann. Const. U. S. p. 41. This was but carrying out the principles by the same court, announced in *Luther v. Borden*, and *Scott v. Jones*, decided before the

rebellion.—7 How. 1 ; 5 How. 343. The principle which runs through all these adjudications is the same. It is that the irregular State governments in Rhode Island and Michigan, and all the rebel governments were illegal, and the courts of the rightful and legal government have no power to remove this illegality. If done at all, it must be done by the rightful and legal legislative authority. Nothing would seem plainer than this, upon universally admitted principles. In the important and strongly contested case of *Luther v. Borden, supra*, the chief justice, who delivered the reasons for the judgment of the court, makes a very strong expression of opinion, to the effect that an illegal government set up within the United States, is a *void government*, and that all who act under its authority are trespassers or criminals.—7 How. 38, 39. This was also the intimation of Woodbury, J., in the case of *Scott v. Jones, supra.*—5 How. 376, 377, 378. The courts of the rightful and lawful government can only declare what the law is—what is legal and what is illegal. This is their sole duty.—Marshall, C. J., in *Marbury v. Madison*, 1 Cr. 137, 177. They can not mend that which is bad, nor make bad that which is good. This is the part of the law-making authority alone. And in this State only the legislative authority can make law.—Const. Ala. 1867, Art. III, §§ 1, 2 ; Art. IV., Art VI. When we look for the law that makes the governments of the organizations of the late rebellion lawful, or the courts or legislatures of these governments lawful, where will it be found? Not in any act of the Congress of the United States—not in the judgments of the highest court of the Union ; and not in any law or any judgment of any lawful and rightful court of this State. But by all these high authorities the very converse has been declared. And this tribunal is bound, by oath, to carry out this declaration, unless it comes to the conclusion that the reconstruction acts of congress are unconstitutional and void ; and that the principle decided in *Texas v. White*, is a solemn mistake.—Const. Ala. 1867, art. 15. But the opinion in the leading case of *Chisholm v. Coleman*, denies to the insurgent government in this State, after secession, the character of a government *de facto*. If

this, along with the admitted illegality of these governments, is maintained, then the whole foundation, upon which the courts and all the departments of these irregular governments rests for legality, is swept away. It seems to me, that this is inevitable, from what has already been decided, both by this court, and in our national court of the highest authority.

The idea that any State governments may be set up within the limits of the State, which are hostile to the constitution of the United States, and which have been established for the purpose of expelling and overturning the authority of the United States, in the State where such irregular State governments are organized, and that their acts and departments may derive validity from the fact that such irregular State organizations are governments *de facto*, and as such entitled to a legal standing in this court without any recognition of the rightful government, either State or federal, is the fruit of a plant that had its root in the theories of the late rebellion. In my humble opinion, it has no sufficient warrant in our form of government or in the constitution of the Union. I, therefore, think that all this court can do in such a case is, sternly to deny it shelter here, as has been done in *Chisholm v. Coleman, supra.*

An attempt to overthrow the government of the United States in any portion of its territory by its own citizens, is rebellion and treason, whether it be put on foot by one man or by five millions of men. The numbers engaged in the effort make no difference.—*United States v. Burr*, 1 Burr Tr. 14; *Ib.* 401, 405, 407; *United States v. Fries*, Whar. State Trials, 458; *Ex parte Bollman*, 4 Cr. 75; *United States v. Greiner*, 24 Law Rep. 92. And all the political machinery organized to support and carry on such an attempt is traitorous and illegal. And the courts of the country, whether State or federal, have no power to remove this illegality. If a contract is made to furnish arms or supplies of any kind, to aid in any manner to carry on such an attempt, it is illegal.—*Patton, Gov., v. Gilmer et al.*, 42 Ala. 548; *Ex parte Bibb & Falkner*, January term, 1870; also, 11 Whea. 258; 2 Pet. 526; 12 How. 79. Then, why

is not a government, or a court, which is but a part of such government, which has been organized for the same or a like purpose, and is equally necessary for that end, equally as bad as the contract ? If the government is put on the better footing, it seems to me, this is but a distinction in favor of the higher and more fatal act of treason. The principle is the same in each case. The thing, either way, is forbidden by law ; and this it is that makes it illegal. What is illegal is void in court, and the court can not help it. Every department of the national and rightful and legal State government has denounced the whole insurrectionary State governments as illegal, without distinction of departments. This illegality must remain until it has been legally and properly removed, by competent legislative authority.

Has this been done by the rightful and legal government ? This is the next question to be considered.

No set of men in a State can confer upon themselves, or assume the power to assemble in convention, and make a constitution and form of government for the people of the State. This was tried in Michigan and in Rhode Island, and in both instances the attempt was pronounced to be void. There can be no legal State government set up in a State of the Union, without congressional recognition, either before the act, in giving the authority, or afterwards in ratification of the precedent act. The president of the United States has no authority to confer this power, or to give it validity by his ratification. Under the novel circumstances in which this State found itself at the end of the late rebellion, it required legislation to restore it to its proper and legal relations to the Union. This legislation involved a national interest, in which not only the people of this State were concerned, but the whole people of the Union. The question was one which more or less effected the general welfare cf the nation. With such a question, congress alone had the authority to deal. Under organizations claiming to be State governments, a portion of the people of the State had attempted to dissever the constitutional connection of the State with the Union, but had failed. During the continuance of this attempt, the terms

of most of the officers of the State government, existing at the commencement of the rebellion, had expired, and there had been no re-elections under the rightful and legal government of the State to supply their places; so that, at the end of the rebellion, there was an interregnum until the rightful and legal government of the State could be restored or reconstructed. The difficulty thus arising could only be obviated by law. Such law congress alone had the authority to enact. The people of the United States constitute one nation, and they did not design to make their national government dependent on the States. Then, when the question for adjustment is national, it belongs to the congress of the Union to adjust it, and not to the States.—*McCulloch v. Maryland*, 4 Whea. 316, 431, 432, *et ubeque; Crandall v. Nevada*, 6 Wall. 35; 1 Kent, 236, 237; *Gilman v. Philadelphia*, 3 Wall. 713; *Cooley v. Wardens Port, Phila.*; Curtis, J., *arguendo*, 12 H. 299, 319.

There can be no doubt, that congress is vested by the constitution with power to preserve the national existence and its territorial integrity, and also to enforce the execution of its own enactments, and sustain the constitution of the Union, as the supreme law of the land, throughout the entire boundaries of the nation. Secession did not interfere with this power; for secession was a nullity. In the constitution there is an express grant for all these important purposes.—Const. U. S., art. 1, § 8, cl. 18; Paschall's Ann. Const. page 138, and cases there cited; Ordn. No. 16 of Conv. 1867; Pamph. Acts 1868, page 167; 6 Wallace, 14. These are powers without limitations. Then, congress had authority to pass that system of laws commonly called the reconstruction acts; and these acts are binding on this court. These acts denounce the government attempted to be set up in this State under the provisional government which followed the suppression of the rebellion, as illegal. The congress refused to acknowledge this government as legal. It rejected its senators and representatives from the halls of legislation of the nation. It was repudiated, and another government was ordered to be formed and established in its stead. This was done. The convention, then, of the 12th September, 1865, was an assembly with-

out competent authority to make a constitution for the State, or to legislate for its people. So far, then, as its ordinances for the ratification of certain laws therein named, and certain acts and judgments, and other proceedings therein mentioned are involved, they are nullities; unless the same have been re-enacted or adopted by the present rightful and lawful government of this State.— Rev. Code, p. 53, Ord. No. 5; *ib.* p. 58, Ord. No. 26. The constitution framed by the convention of the 12th September, 1865, was never submitted to any vote of the people, and it was never adopted by them. It was never the constitution of the State. The people alone are the constitution-makers.—6 Wheat. 389, 390.

So far, then, as the judgments in favor of Noble & Bro., and in favor of Peter B. Mastin, which has been revived in the names of his executors, are concerned, they are yet without valid legalization. The present State government, by its convention, and subsequently by its general assembly, has acted upon the question of the validity of these judgments, and these authorities have only ratified them so far as to make the proceedings had in the rebel courts a basis for an application for a new trial.—Acts 1868, page 186; Ordn. No. 39; *ib.* p. 269; Act No. 48; *Ex parte Norton & Shields,* and *Ex parte Bibb,* January term, 1870.

The legislative authority having gone thus far, and no farther, this court, it seems to me, is not permitted to go beyond this limit; because the only law upon this subject ends here, and here the court must stop. The limit fixed by the general assembly is the limit of the court.—*Cohens v. Virginia,* 6 Wheaton, 260, 335. This can not be transcended without a disregard of law. If further remedy is needed, it is not in this tribunal, but in the legislative department of the rightful and legal government of the State, that it is to be found.

Courts of law, at common law, were authorized to protect their own officers, when acting *bona fide* in executing the process of the court, from the risk of double liability of two or more different claimants. And this practice has been adopted in our own system, and sanctioned by our predecessors in this tribunal.—2 Chit. Gen. Pr. 341, and

cases there cited ; *Jones v. Hutchinson*, June term, 1868, in manuscript. Then the interpleader suit in the circuit court was proper.

The question attempted to be raised on the judgments on the motions to amend the sheriff's return on the *fieri facias* in the court below, can not come up in this case, except as a question of evidence. The judgments on these motions were not appealed from. They were, therefore, final, and they can not be collaterally impeached in this proceeding or upon objection to these judgments on the motions, as evidence. But if this could not be done, the circuit court, in which the motions in these cases were made, so far as the appellees were concerned, had jurisdiction to hear and decide the motions to amend. And it appears that the proofs are amply sufficient to sustain the judgments allowing the amendments.—*Brandon v. Snow et al.*, 2 Stew. 255 ; Rev. Code, §§ 2808, 2809 ; 3 Chit. Gen. Pr. 55, 56, marg. ; *McArthur v. Carrie, Adm'r*, 32 Ala. 75.

Under this view of the proceedings in the circuit court, which have been brought into this court, the judgment of the court below is affirmed ; and the costs will be divided. The said appellants, Noble & Brother, will pay one-half the costs of this cause in this court, and of the proceedings in the court below, necessary and proper to bring the cause into this court, and the said Mary Mastin and William A. Graham, said executors of the last will and testament of said Peter B. Mastin, deceased, will pay the other half of the costs of said cause, to be levied of the goods and chattels of said deceased, in their hands to be administered.

The chief-justice concurs in the result of the above opinion, but for the present he bases his concurrence upon the argument delivered by him in the case of *Martin v. Hewitt*, at the present term.

B. F. SAFFOLD, J., *(dissenting.)*—This cause was a contest between judgment creditors concerning the disposition to be made of a sum of money obtained by the sheriff on a sale of their debtor's property. Some of the judgments were rendered before the date of the ordinance of

Noble & Bro. et al. v. Cullom & Co. et al.

secession, and others were obtained afterwards. It is immaterial for me to inquire into the minute incidents affecting the superiority of the claims of the respective contestants. The decision of this court was placed entirely upon the ground that judgments rendered during the attempted secession of the State from the Federal Union, must be postponed to those of anterior date. They were treated by Justice Peters, in his opinion, as mere nullities, and by the chief-justice, as foreign judgments, constituting mere causes of action, impeachable for irregularity or undue obtainment. From these enunciations of legal principles I dissent, for many, and, in my opinion, cogent reasons.

It has been now nearly ten years since the commencement of events evolving misfortunes which have penetrated into every household, and demoralized our entire population. The point of greatest depression seems at last to be reached, and our people are beginning to recover from their deep distress, reconciled to what has transpired, and hopeful of repairing their shattered fortunes. During all this past time these judgments have been treated as valid, both by the legislative and judicial departments of the State. The people have contracted in reference to them as such, and the tenure of much property is dependent upon them To unsettle these titles, and launch anew all those whose. interests are inseparably interwoven with them, on a vast sea of litigation, will, I fear, tend to familiarize the people with revolution. It will make them incredulous of any speedy and continuing reign of tranquillity, and desirous of change, though it be for the worse. I should be loth to hold, that there could be any time or place in which human beings might exist without some regulations for the preservation of right, and the restraint and punishment of wrong—some laws and rules of society which would remain obligatory, in their effects, between themselves, at least, even after they had emerged into a more extended theatre, and were living under more propitious auspices. I admit that in case of either successful or subdued rebellion, or where one independent nation has succumbed to another, the victors may enact such changes of domestic policy as their own government will authorize, or humanity will sanc-

tion.   This, however, must be done by the legislative power
expressly.   Otherwise, the courts are bound to recognize
the rights and duties of the people between each other,
as prescribed and determined by their local laws and judi-
cial decisions, except so far as they militate against the laws
and institutions of their own country.

In a practical sense, the people, the territory, the laws,
the structure of the courts, the property in great measure,
the offices, the government of the State of Alabama, be-
fore, during and since the rebellion, are identical.   There
has been an insurrection of vast proportions; and it has
been subdued.   The participators in it were alone amena-
ble.   Their act of secession was simply void.

The people of the State, during the war, occupied a pe-
culiar and difficult position.   If they refused to recognize
and to participate in the litigation of the courts, the estab-
lishment of the Confederacy would have worked the for-
feiture of their rights, through their default.   If it failed,
and all the acts done under the authority of its State gov-
ernment were to be null and void, serious injury would re-
sult to them on account of their recognition.   The issue of
good or evil was thus presented to them, dependent alone
upon the success or failure of the Confederacy, without
regard to the purity of their intentions.

If the legislative department of the Federal or State
government has defined their status during that time, it is
the duty of the courts to conform their decisions to it.
Has this been done?

In the first place, the rebellion was one of great propor-
tions, embracing at least one-half the territory and one-
third of the population of the Union.   It organized and
conducted for four years a government complete in all its
forms and functions, dealing with the lives, liberties and
property of all its people.   The United States exercised
towards it belligerent rights, in the exchange of prisoners,
the establishment of blockades, and the capture and con-
demnation of prizes in the prize courts.   After its suppres-
sion, none of its adherents were dealt with criminally, which
would have been an imperative duty if it had been merely
a popular commotion or seditious obstruction of the laws.

There have been repeated positive expressions of the legislative will concerning these judgments. The Constitutional convention of 1867 established them, by providing for new trials under certain circumstances within a limited time.—Ordinance No. 39. The legislature of 1868 repeatedly recognized them as valid and subsisting judgments ; on the 12th of August, by an act authorizing appeals to the supreme court, and proceedings in chancery, for the correction of errors in them, if prosecuted within a specified time ; on the 10th of October, by an act extending the time granted by ordinance 39, on proof of meritorious defense, provided the judgment had not been fully paid ; on the 29th of July, by an act adopting the Revised Code of 1867, containing section 2832, providing for the issue of an execution on judgments rendered between the 11th day of January, 1861, and the 15th of December, 1865, without a revival. In addition to these instances of express recognition and adoption, there are many others of incidental and implied recognition by allusion to, repeal or amendment of laws affecting them.

The judicial and administrative departments of the government also recognized and executed them throughout, the time of the provisional government established by congress under its immediate supervision and control.

It is objected that no act of legislation can validate the pretended judicial action of a usurper, or of tribunals which had no lawful jurisdiction of the subject-matter or the parties over whom they assumed to exercise judicial authority. The fault of the proposition is in its application.

The supreme court of the United States has characterized the government established in the insurgent States as a government of paramount force, to which the United States conceded the rights and obligations of belligerents, regarding its territory as that of an enemy, and holding its citizens, in many respects, for enemies. The same high tribunal has said that it made obedience to its authority in civil and local matters, not only a necessity, but a duty, without which civil order was impossible.—*Thorington v. Smith,* 8 Wall. 1.

37

Noble & Bro. et al. v. Cullom & Co. et al.

The chief-justice, in *Martin v. Hewitt* (present term) holding these judgments to be foreign, says : " Accurately speaking, they (the insurgent governments) were not foreign governments, nor were the judgments of their courts foreign judgments."

The United States supreme court, in *Texas v. White,* (7 Wall. 700,) says : " Each insurgent State continued to be a State, and a State of the Union, with her obligations as a member of the Union, and of every citizen of the State, as a citizen of the United States, remaining perfect and unimpaired." " Acts necessary to peace and good order among citizens, such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing remedies for injuries to person and estate, and other similar acts, which would be valid, if emanating from a lawful government, must be regarded, in general, as valid when proceeding from an actual, though unlawful government ; and acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void."

Against these legislative sanctions, judicial interpretations, and undeniable deductions from facts, are we permitted to treat these judgments otherwise than as valid domestic judgments? Ought we to do so, if at liberty ? The law is not a Procrustean bed by which human affairs must be measured, nor does it furnish a water of jealousy, ascertaining truth beyond doubt. Like the Sabbath, it was made for man, and not man for it.

Note by Reporter.—At a subsequent day of the term, Messrs. Chilton & Thorington applied for a rehearing, and filed the following argument in support thereof.

We are free to admit that this court will take judicial notice of the ordinance of secession, and of the war, and after hostilities commenced and were recognized by the government of the United States, and the Southern States

declared in rebellion, and non-intercourse laws passed, we concede that every one domiciled in the Confederate territory must be regarded for the time as an enemy of the United States government; but the ordinance of secession had no such effect. That was a mere *brutum fulmen*. It was the *action* which followed it—the *forcible resistance* to the authority of the government, culminating in a public war, which fixed the status of the Confederate States, and suspended the operation of the constitution and laws of the United States, not *de jure*, but simply because of the impracticability of their enforcement. Suppose, for illustration, that one hundred or one thousand people should assemble now in Alabama, and declare that the ties which bind Alabama to the Union are henceforth severed, and that the State is an independent republic. What of it? Would this affect the status of the State as respects her relation to the Union? Certainly not! Such a proceeding might be never so foolish or so wicked, but *in law* it would affect nothing. Just so, the ordinance of secession of 11th January, 1861, *abstractedly* considered, amounted to nothing. It was a void act, and as such could not change the status of the State, nor deprive any citizen of that protection which the constitution and laws of his country confer upon him. Now, when our judgments were rendered there had been no act of hostility, no rebellion *then* existed, no *force* applied, but simply *paper declarations* of independence of the United States government. It was not until the middle of April, 1861, that the *first force* was used in the capture of Fort Sumter. Suppose the day before this first attempt at actual hostility, the whole scheme for setting up an independent government had been abandoned, could it be said that the judgments of a State court were invalid simply because of the act of secession? Would this, or any court have tolerated the argument, that the proclamation of a self-constituted body of men in the State, striving to withdraw from the parent government, should have the effect of placing the loyal citizens beyond the pale of protection under that government?

We then insist upon our right to the fruit of our judg-

ment into which our contract has been merged, and which the decision of the court strikes down, thus destroying the obligatory force of the contract, and our vested right under the constitution of the United States. We submit that our right to the fruits of our judgment is secured by the fundamental law of the Union, which was over us as a shield when the judgment was rendered, and the money in controversy was levied under it.—See *Bronson v. Kinzie*, 1 How. 311 ; *McCracken v. Haywood*, 2 How. 608 ; *Gautty v. Ewing*, 3 How. 707 ; *Howard v. Bugbee*, 24 How. 461 ; *Rue v. Decker*, 3 McLean, 575 ; *Stockwell v. Kemp*, 4 McLean, 80 ; *United States v. Conway*, Hemp. Rep. 313 ; *Moore v. Fowler*, Hemp. Rep. 536.

The obligation of the contract, or the judgment into which it is merged, may as readily be destroyed by acting on the remedy as upon the contract. It is the remedy, the right to recover and have satisfaction, that gives to any executory contract its binding force and obligation.

Did Alabama ever cease to be a State in the Federal Union? If so, at what point of time, and by what act or acts? We say, she made an attempt to withdraw, but her attempt was abortive, and she has *in legal contemplation* never been out of the Union. The court, in the opinion in this case, declares secession a nullity, and being void, no such tremendous consequences as putting the State out of the Union could result from this void act. If resistance and force put her out, she certainly remained in until such force was used ; but we have shown that no such force was resorted to until long after our judgments were rendered. So that it results that our judgments rendered in March, 1861, are valid, even though we were to admit that judgments rendered *flagrante bello*, were void.

The case of *Chisholm v. Coleman*, 43 Ala. 204, is cited, as furnishing a correct exposition of the law, and according to that case this case must be decided for us, for in that case the court decreed pay to Judge Coleman from the 31st of March, 1862, up to the 16th of May of that year, when he joined the army as colonel of one of the regiments of the Confederate States. The court say that they can not *know* that he did not remain loyal up to the latter period.

This shows clearly that the court, *in the absence of all proof* to sustain the assumption, will not intend that a sworn officer of the law, a judge of one of our courts, without being impelled by some irresistible force, would, in disregard of his oath of office, commit, what this court denounces as treason against the government of the United States, by making his court an adjunct to the rebellion, and thus assisting in overthrowing the power which brought his court into being, and conferred upon him the honor of presiding over it. We invoke the maxim on which courts uniformly act, *"omnia presumuntur rite esse acta."* As, then, the court rendering our judgments, and the judge who presided over it, might have been loyal, as nothing is shown to the contrary, they must be presumed to have been loyal, and the judgments must be presumed to have been properly rendered.

3. We insist, that these judgments have been validated by virtue of authority conferred by the act of congress known as the reconstruction act, passed 2d March, 1867. The third section provides, among other things, " that it shall be the duty of each officer, assigned as aforesaid, to protect all persons in their rights of person and property," &c. ; and by the last section (§ 6) it is provided, " that until the people of said rebel states shall be admitted by law to representation in the congress of the United States, any civil government that may exist therein shall be deemed provisional only," &c. Now, the provisional government that did exist therein, both by its convention and laws, declared these judgments, and the several acts of the legislature not passed in aid of the war, nor opposed to the constitution of the United States, valid and binding.—See ordinance 28th September, 1865, Code, pp. 58, 59 ; Act adopting the Code, February 19, 1867; Preface to Rev. Code, page 4; Revised Code, §§ 2832, 2825, 2827.

The Revised Code was not only adopted by the provisional government, but was also adopted by the present State government, on the 29th day of July, 1868.

The ordinance of 1865, validating judgments rendered during the war, forms a part of this Revised Code ; besides this, various provisions of said Code treat such judgments

as valid beyond all question. Section 2419 of the Revised Code requires that, if no execution be sued out upon a judgment within one year from its rendition, a *scire facias* shall issue *quare executionem non* before an execution can issue, but inasmuch as the unsettled condition of the country during the war might have prevented parties from enforcing their judgments, by the issue of an execution within the year, section 2832 of the Code provides as follows: "In all cases where judgments have been rendered in any of the courts in this State since the 11th day of January, in the year 1861, and prior to the 15th day of December, in the year 1865, on which no execution has issued, execution may issue without a revival of such judgments, but no lien of any judgment or execution existing at the last mentioned day shall in any manner be affected by the provisions of this section." Again, in section 2825, Revised Code, the validity of judgments rendered during the war, on contracts made between the 1st day of May, 1865, (which was the period in which Confederate money was in circulation) might be tested by being vacated and set aside on motion of defendants, upon proof made, before the courts in which such judgments were rendered, that the defendants were by any means deprived of such defense as they would have been entitled to under the provisions of an ordinance entitled, " An ordinance to ratify certain acts, judgments," &c. Again, in section 2827, it is provided as follows: " The parties against whom judgments or decrees were rendered in courts of record, after the 11th day of January, 1867, are, upon application within one year after the approval of this law, on the 11th of February, 1867, entitled to a new trial, upon affidavit showing that the failure to make defense to the suits, in which such judgments or decrees were rendered, was not owing to any fault on their part, and that they had no attorney present in court when such judgments or decrees were rendered ; provided, that the court shall be satisfied from all the facts that may be submitted by affidavits of both parties, that a good and meritorious defense exists either in whole or part. This section applies to plaintiffs as well as defendants."

By ordinance of the convention of December 6th, 1867,

(see ordinance 39,) judgments rendered since January, 1861, are expressly recognized as valid, and new trials are allowed to be had upon such judgments, provided the courts shall be satisfied from all the facts that a good and meritorious defense exists, and provided the application is made within twelve months from the date of the ordinance ; and by an act of the legislature of this State, approved October 10th, 1868, this ordinance, (No. 39,) was re-enacted, and the time for applying for new trials extended until the 20th June, 1869, provided the court should be satisfied upon the hearing of the application that a good and meritorious defense existed.—See Acts 1868, pp. 186, 187 ; and for the act extending said ordinance, see *ib.* 269,

The same legislature fully recognized the validity of those judgments, even though rendered by default, by the attempt to declare certain of them void, and to repeal the lien given to them by sections 2867, and 2877 of the Code, but this act has been declared unconstitutional and void. *Weaver et al, v. Lapsley,* 43 Ala. 224.

Thus, we find that our judgments, if we concede they were rendered during the war, and were void for that reason, have been recognized and validated by both the provisional and present State conventions and legislatures, in almost every conceivable form. We submit, whether a judgment rendered in March, 1861, even though no execution had been issued upon it before, may not be enforced by execution, and this without *scire facias* to revive it. If the court decide that execution can not issue upon it, then your honors annul section 2832 of the Code which declares that such execution may issue. This section of the Code is not opposed to the laws or constitution of the United States, and was not made in aid of the war ; it is, therefore, a legitimate portion of the Code, as provided by the law of 1867, above quoted, adopting it, and the act of 1868, which continues it in force. We insist that the court has no power to go behind the Code to ascertain from what source its provisions have been derived ; they may have been copied from the ordinances of the convention of 1865 ; from the acts of the legislature during the war, or of the provisional legislature since the war ; they may have been

taken from the statutes of New York, as many of them were, or from other States; the simple question is, have they been adopted as a part of the Code of laws of the State of Alabama, and are they in accord with the constitution and laws of the United States and of the State of Alabama? These questions being decided in the affirmative, we submit, that it is the duty of the court to uphold and administer them; otherwise, the court exercises legislative powers, which is prohibited to it by the constitution.

4, We come next to consider whether judgments and legislative acts simply affecting private rights rendered and enacted by the State under her Confederate organization, but wholly disconnected from the war, and not opposed, in themselves considered, to the constitution and laws of the United States, or the State of Alabama, shall be held invalid by reason of their having been rendered, or enacted, by the judiciary or legislature of the rebel government.

The great effort of all civilized governments is to assuage, as far as possible, the horrors and evil consequences resulting from war. This is demanded by the instincts of a common humanity, and the punctilious observance of this principle has marked the progress of civilization and christianity of modern times. The judgment which the court has rendered in this case, in its results, will work out a train of evils upon the people of this State which can scarcely be computed; such a decision, therefore, should have for its predicate the clearest and most indubitable, as well as the most inexorable rules of law and logic. It affects alike the loyal and the disloyal; those who were active in getting up the rebellion, and those who were forced involuntarily to take part in it, or persistently refused to countenance it.

We think we have shown that the rules of law do not justify, much less require, such a decision, and we now propose to fortify our position by citing some of the authorities in the supreme court of the United States, and of eminent publicists and writers on the law of nations. In *Thorington v Smyth & Hartley*, (8 Wall. p. 1,) the supreme court of the United States clearly defines the character of the Confederate government. It was a government of paramount force, and like Castine, while in the British posses-

sion in the war of 1812, or Tampico, while in our possession during the Mexican war, it was supreme in its authority and control while it existed. " It made," (says the court,) " obedience to its authority in civil and local matters, not only a necessity but a duty." In the case of *White v. The State of Texas*, (7 Wallace, 700,) it is said that, "considered as transactions under the constitution, the ordinance of secession adopted by the convention, and ratified by a majority of the citizens of Texas, and all the acts of her legislature intended to give effect to that ordinance, were absolutely null. They were utterly without operation in law. The State did not cease to be a State, nor her citizens to be citizens of the Union."—See 7th head-note, pp. 700, 701. And in the 16th head-note, page 702, it is said, " that acts necessary to peace and good order among the citizens, such, for example, as acts sanctioning and protecting marriage and the domestic relations, governing the course of descents, regulating the conveyance and transfer of property, real and personal, and providing *remedies for injuries to person and estate*, and other similar acts, which would be valid if emanating from a lawful government, must be regarded, in general, as lawful when proceeding from an actual though unlawful government; and that acts in furtherance or support of rebellion against the United States, or intended to defeat the just rights of citizens, and other acts of like nature, must, in general, be regarded as invalid and void."

All the judges of the supreme court, except Justice Grier, were agreed upon the merits of said cause; and he went further than any of the judges, in holding that the act of the government of Texas, during the war, in disposing of her United States bonds, although for war purposes, was valid and binding on the State.—See p. 739. If this decision of *Texas v. White* is to be maintained as the law, and the remedy given by the rebel States for the securing of private rights resulting in a judgment, is to be upheld as though the judgment had been obtained in the court of the State of Alabama while a member of the Union, then this controversy is ended and our judgments must be held valid. Why should not this court so hold?

The supreme court thus holds, in the absence of all re-
cognition of the validity of such acts by the loyal State
government, what this court, as we have shown, are fully
authorized to decide by the ordinances and statutes of
the loyal State.

The people of the State must need have some law and
some mode of administering and enforcing it, even during
a rebellion.  They can not live, and ought not to be re-
quired to live, in a state of anarchy.  Upon principles of
pure christian humanity, no christian sovereign would re-
quire of subjects, even in a state of rebellion against him,
thus to live.—3 Phill. Int. Law, pp. 718, 719; Lawrence's
Wheat. on Int. Law, 536; *Foster's Crown Cases*, 188; Gro.
on War and Peace, book 1, ch. 4, § 15; Halleck on Inter-
national Law, 792.

PETERS, J.—The appellants make an application, in
this case, for a rehearing.  This application is based
mainly on the grounds that the validity of the judgments
rendered after the 11th day of January, 1861, in the
judicial tribunals sitting in this State, were not necessarily
void; that this was not a question of law, but a question
of proof, which the court could not judicially know; and
that such judgments have been made good by the effect of
the reconstruction acts of the congress of the United
States, passed over the president's veto in 1867.

The former of these questions is so fully discussed in
the opinion delivered in this cause upon the hearing in
chief, that the repetition of the argument on this applica-
tion is deemed needless.

It is true, that errors not insisted on in the court below,
generally, will not be considered for the first time on ap-
peal to this court.—42 Ala. 108; 9 Ala. 19; 17 Ala. 696.
But this court, in seeking reasons for its judgments, is not
bound to confine itself to the reasons upon which the infe-
rior tribunal acted.  If the court below decided rightly,
but gave a wrong reason for its judgment, this court is
under no obligation to pursue a line of argument, or to
restate the reasons of the court below.

The courts of a State make a part of the government of

a State.—Const. Ala. 1868, art. 3, § 1. And if the government of the State is overthrown, the judicial tribunals are overthrown with it. This court takes judicial notice of the legal government of the State, and as a part of this government, it also takes notice of the legal courts of this legal government. It takes notice also of the jurisdiction and the incidents, which, by law, belong to these courts. It must, then, necessarily take notice of their changes, suspensions or suppressions, or when they cease to exist. These positive and negative facts are alike the subjects of judicial cognizance without proof.—1 Greenl. Ev., chapter 2, §§ 4, 6.

It is too patent to allow of any serious controversy, that there was a suspension, if not a suppression of the rightful legal government of the State of Alabama during the late rebellion. And it is equally well known that, in this State, the rebellion anticipated the passage of the ordinance of secession, on the 11th day of January, 1861. The public arms deposited in the arsenal at Mount Vernon, in this State, were seized by authority of the government having control of Alabama just before that event. This deposit consisted of about 17,000 muskets and rifles, besides other military stores. And Forts Gaines and Morgan were also captured before secession, or immediately after it, by order of the same authority; and the nucleus of a volunteer army of soldiers was formed to resist, with force and arms, the laws and jurisdiction of the United States.—Annual Cycl. 1861, p. 123; Gov. Moore's message to the "Gentlemen of the House of Representatives," of the first rebel legislature held in this State after secession, January 14th, 1861; Ordinance No. 10, Convention January 7th, 1861; *The United States v. Andrew B. Moore*, U. S. District Court, Montgomery, Alabama, No. 1080, in manuscript. And after mentioning the purchase of canon, large quantities of lead, and "one million and five hundred thousand caps," the governor (Moore) in his message above referred to, goes on to say: "The convention," (*i. e.* of Jan. 7th, 1861,) "on the —— inst., authorized me to dispatch troops from this State to aid the State of Florida in taking possession of the forts at the mouth of Pensacola harbor. Accord-

ingly, on the —— inst., I ordered three hundred men from Mobile by water, and dispatched five companies, under command of Col. Lomax, by rail from this place, to proceed to Pensacola."—Journal Called Session Senate of Alabama, January 14th, 1861, p. 12. These troops proceeded to Florida under this order, and accomplished a part of the purpose of their mission. And before this, and as early as the 8th day of January, 1861, commissioners were appointed by the same government, then discharging its functions in this State, to each of the slaveholding States of the Union, for the purpose of inducing them to break up the government of the United States, in conformity with the military operations above mentioned.—Journal of Convention, January 7th, 1861, pp. 16, 17. Moreover, all the officers of this State were absolved from the oath to support the constitution of the United States, which they had taken before the act of secession ; and they were all continued in office under the new government set up after secession.—Ordinance Convention, January 7th, 1861, Nos. 3 and 10, pp. 8, 16. The former of these ordinances purports to have been passed on the 29th of January, 1861, and the other on the 23d day of the same month.

Hence, then, it follows that after these acts of open and defiant rebellion, and after the passage of the ordinance last above mentioned, all persons who continued to discharge the function of any office, whether judicial or otherwise, in this State, did so as officers of the insurgent organization, which was then, and until the failure of the insurrection continued to be, the only government exercising authority in this State. This government was set up, sustained, and carried on in defiance of the authority of the constitution of the United States, and in open and intended violation of its provisions.—Pamphlet Acts, Called Session, January 14th, 1862, *passim*. Such a government was, therefore, unconstitutional and utterly void, in all its departments. All the acts of a void government are necessarily void. *Ex nihilo nihil fit.* That which is utterly void can not be ratified. It is of no effect and absolutely null, and can not be made good, for there is nothing to make good.—2 Burr Law Dict. 601, *vox void.*

This court must take judicial notice that the legal government of the State of Alabama, and its legal courts had been wholly and utterly overturned by the rebellion, before the date of the judgments in favor of Noble & Brother, and in favor of Mastin, were rendered—that is, before the 8th and 12th days of March, 1861; and that the government then existing and in power in this State, was unconstitutional and void.—*Texas v. White*, 7 Wall. 700. This being so, these judgments were not judgments of a court that can be noticed, or its decrees enforced in this tribunal. If this be admitted—and I do not see how it can be rationally denied—then the argument of the eminent counsel for the appellants falls to the ground.—*Luther v. Borden*, 7 How. 1; *Scott v. Jones*, 5 How. 343.

The government here relied on by the appellants, is not like that established in New Mexico, under which the case of *Leitensdorfer v. Houghton*, arose.—20 How. 1761. The government in New Mexico was not void or voidable; it was set up under "the authority of the United States." The Confederate States government in Alabama was erected in opposition and hostility to the national authority, and for the purpose of its destruction. There is, then, no analogy between these cases. The one was established by legal authority, but the other by an authority wholly illegal and void.—*Mauran v. Insurance Company*, 6 Wall. 1, 13, 14.

The Confederate States government in this State, from January 11, 1861, until the overthrow of the rebellion, was a mere insurgent organization, which was wholly forbidden by law. It could not confer upon itself any legal authority. It was against the public policy and the constitution of the Union; and its acts, in all its departments, are illegal and equally vicious. And this vice can not be removed by the courts. Only the legislative power can do this; and this the rightful legislative authority has refused to do. Then, this court has no law to authorize it to say that these judgments have any validity whatever, except, perhaps, as the decrees of foreign courts.—*Martin v. Hewitt*, June term, 1870, Chief Justice Peck, *arguendo*.

But it is contended by appellants that the judgments of

the courts of the Confederate State government erected in the State of Alabama, during the supremacy of the late rebellion, were rendered valid and effectual in law by the act of the congress of the United States, entitled "An act to provide for the more efficient government of the rebel States," passed over the president's veto, on March 2d, 1867.

It is urged that the third clause of the first section of this enactment has this effect. The clause referred to is in these words : "3. It shall be the duty of each officer assigned as aforesaid to protect all persons in their rights of person and property, to suppress insurrection, disorder and violence, and to punish, or cause to be punished, all disturbers of the public peace and criminals ; and to this end he may allow local civil tribunals to take jurisdiction of and to try offenders, or when, in his judgment, it may be necessary for the trial of offenders, he shall have power to organize military commissions or tribunals for that purpose, and all interference under color of State authority, with the exercise of military authority, under this act, shall be null and void."

The so-called Confederate government, in the State of Alabama, during the late insurrection, was either a legal government or it was an illegal government. If it was legal, it must have been a rightful and constitutional government. Then, the congress of the United States could not overthrow it, or suspend it, or interfere with it, any more than it can to-day interfere with the rightful and constitutional governments of the States of Massachusetts, Pennsylvania, or New York. It would be too palpable an absurdity to pretend that these latter governments could be so interfered with or suspended, or displaced by congress, to need an argument to refute it.—Constitution United States, art. 4, § 4 ; *Luther v. Borden*, 7 Howard 1 ; *Scott v. Jones*, 5 Howard, 343 ; Paschall's Ann. Constitution United States, p. 242, *et seq. ;* 3 Howard, 224 ; 13 Howard, 26.

But it has been declared, both by the congress of the Union, and by the highest judicial authority of the Union, that this insurrectionary government was illegal and void,

because it was wholly unconstitutional.—*Texas v. White*, 7 Wall. 700 ; Acts of Congress, July 18th, 1867, supplemental to the reconstruction acts above quoted, § 1. This act of congress inflicts the vice of illegality upon the "government" of the insurgent organization.

It does not spare one branch of this government, or any branch of it, but it strikes down the whole. Then, the acts of every branch of it are bad. Not because the law itself was obnoxious to the constitution of the Union, for it was not so, but because the government that enacted it was unconstitutional and void, and necessarily had no legal power to enact any valid law. This was the only point decided in the case of *Texas v. White*, 7 Wall. 700, *supra*, except the question of jurisdiction.

Then the reconstruction acts did not give validity to the Texas rebel statute. Neither, then, can it give validity to the Alabama rebel judgments. *Ubi eadum ratio, ibi idem jus.*—Co. Litt. 10, *a*.

Besides this, it may be well doubted whether congress has any legitimate authority to intermeddle with the judgments of a State court, either to make them good or to make them bad, or to impose upon the legal rightful government of a State, the enforcement of the laws or judgments of a rebel insurgent organization erected in such State, in defiance of the constitution of the Union, and for treasonable purposes.

What effect shall be given to such laws and such judgments, is wholly a domestic affair, and it must be left to the rightful State government, upon its restoration, to deal with them as it pleases.—*Sims' Case*, 7 Cush. Rep. 285 ; 8 Wheat. 1 ; 12 How. 293 ; 8 How. 82, 493 ; 3 How. 720 ; 5 How. 115 ; 10 How. 399 ; How. 522 ; *New York v. Miln.* 11 Pet. 138 ; Gardner's Inst. pp. 30, 31, 32.

The judgments of the rebel courts, in this instance, were not judgments of a constitutional court, and the parties who claim rights under them are not entitled to any constitutional protection. Such courts were foreign affairs.— *Scott v. Jones*, 5 How. 343 ; 19 John. R. 59 ; 4 Hill's R. 16J ; 5 Binn. 355.

All offenders against the law are apt to think themselves

ill used, if they are punished for their crimes ; and those who commit treason, the most inexcusable of all offenses, especially when committed without cause against the best government on earth, are not more free than others from this weakness. The theory that begs to have these insurrectionary governments sustained, because the insurgent power has broken down in ruin, is fatal to the security of the public peace and to the safety of the people. It should therefore find no shelter or encouragement in the people's courts. The objection to the contrary is, that this overturns the law during the rebellion. This is not so.

It only declares that there was no government to enforce the law during this unhappy period ; and those who complain of such results, complain to denounce their own acts. The presumption that sets these insurrectionary, unlawful and forbidden governments on the basis of legal authority, by reason of their necessity, will change the republic into an empire and a tyranny for a like reason.

It destroys all logical distinction between a government of lawless force and a government founded upon a written constitution, owing its authority to the free consent of the governed ; which is the true and safe American doctrine. Declaration of Independence, Revised Code, part 1 ; Gard. Insts. pp. 56, 57, at top.

The rehearing is denied, with costs.

SAFFOLD, J., dissenting.